No. 22-60556

# In the United States Court of Appeals for the Fifth Circuit

PORT ARTHUR COMMUNITY ACTION NETWORK,

*Petitioner*,

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; AND JON NIERMANN, IN HIS OFFICIAL CAPACITY AS CHAIRPERSON OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Respondents.*

On Appeal from Texas Commission on Environmental Quality
Docket No. 2021-0942-AIR

## BRIEF OF APPELLANT
## PORT ARTHUR COMMUNITY ACTION NETWORK

Amy Catherine Dinn
Texas Bar No. 24028601
Natasha Bahri
Texas Bar No. 24101476
Chase Porter
Texas Bar No. 24102368
Lone Star Legal Aid
1415 Fannin Street
Houston, TX 77002
713-652-0077 ext 8108
adinn@lonestarlegal.org
nbahri@lonestarlegal.org
cporter@lonestarlegal.org

Colin Cox
Texas Bar No. 24101653
Environmental Integrity Project
1206 San Antonio Street
Austin, TX 78701
832-316-0580
colincox@environmentalintegrity.org

*Counsel for Petitioner-Appellant Port Arthur Community Action Network*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| Jon Niermann | Toby Baker of Texas Commission on Environmental Quality Austin, TX |
| Jon Niermann | Mark Steinbach of Office of the Attorney General of Texas Austin, TX |
| Jon Niermann | Erin Snody of Office of the Attorney General of Texas Austin, TX |
| Texas Commission on Environmental Quality | Toby Baker, former Executive Director of Texas Commission on Environmental Quality Austin, TX |
| Texas Commission on Environmental Quality | Erin Chancellor, Interim Executive Director of Texas Commission on Environmental Quality Austin, TX |
| Texas Commission on Environmental Quality | Mark Steinbach of Office of the Attorney General of Texas Austin, TX |
| Texas Commission on Environmental Quality | Erin Snody of Office of the Attorney General of Texas Austin, TX |

| Appellants: | Counsel for Appellants: |
| --- | --- |
| Port Arthur Community Action Network | Natasha Bahri of Lone Star Legal Aid Houston, TX |
| Port Arthur Community Action Network | Amy Dinn of Lone Star Legal Aid Houston, TX |
| Port Arthur Community Action Network | Colin Cox of Environmental Integrity Project Austin, TX |
| Port Arthur Community Action Network | Chase Porter of Lone Star Legal Aid Houston, TX |

| Other Interested Parties: | Counsel for Interested Parties: |
| --- | --- |
| Port Arthur LNG, L.L.C. | Aaron Streett of Baker Botts, L.L.P. Houston, TX |
| Port Arthur LNG, L.L.C. | Derek McDonald of Baker Botts, L.L.P. Austin, TX |

*/s/ Amy Catherine Dinn*
Attorney of record for Appellant
Port Arthur Community Action Network

# STATEMENT REGARDING ORAL ARGUMENT

Petitioner Port Arthur Community Action Network ("PACAN") respectfully requests oral argument. This appeal will require the Court to consider whether the issuance of an air pollution permit by the Texas Commission on Environmental Quality ("TCEQ" or "Commission") was invalid, arbitrary, or unreasonable. Oral discussion may benefit the Court in understanding the technical and factual background of the permitting program and resolving the legal issues.

Oral argument will also assist the Court in understanding the larger policy implications of TCEQ's rejection of Federal law for communities like Port Arthur, which are already burdened with existing and planned facilities under TCEQ's purview. The Federal Clean Air Act requires major new industrial sources to install *best available control technology* ("BACT") to limit their air pollution. By definition, BACT is not stagnant; industrial processes improve and pollution control technologies get better over time. TCEQ rejected this technology-forcing concept embedded in the BACT-setting process when it approved air pollution limits ("emission limits") for the Port Arthur LNG terminal. Specifically, TCEQ failed to set permit limits for nitrogen oxides and carbon monoxide at levels the agency previously set at other similar facilities, like Rio Grande LNG near Brownsville. TCEQ failed to apply the correct Federal BACT standard, and—as the U.S. Environmental Protection Agency ("EPA") agreed—misapplied the Federal EPA

guidance. TCEQ failed to act in accordance with its own philosophy "to apply regulations clearly and consistently" amongst permit applicants.[1]

---

[1] TCEQ's Agency Philosophy, available at https://www.tceq.texas.gov/agency/mission.html.

# TABLE OF CONTENTS

**Contents**                                                         **Page(s)**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................................iii

TABLE OF CONTENTS.......................................................................................v

TABLE OF AUTHORITIES ..................................................................................1

JURISDICTIONAL STATEMENT .......................................................................6

STATEMENT OF THE ISSUES............................................................................8

STATEMENT OF THE CASE................................................................................8

SUMMARY OF THE ARGUMENT ....................................................................14

ARGUMENT ........................................................................................................17

   I.   STANDARD OF REVIEW ..........................................................................18

   II.   PACAN HAS STANDING TO CHALLENGE THIS AIR PERMIT............20

       A.   Mr. Beard Has Standing to Sue in His Own Right .............................21

       B.   PACAN's Interests in this Matter are Germane to its Purpose...........31

       C.   This Challenge Does Not Require Individual Participation ...............33

   III. TCEQ'S FINAL ORDER ISSUING THE PERMIT WAS INVALID, ARBITRARY, OR UNREASONABLE .......................................................34

       A.   The Federal Clean Air Act Defines Best Available Control Technology, Not TCEQ........................................................................................36

       B.   Port Arthur LNG's BACT analysis was deficient because it failed to consider lower $NO_x$ and CO limits at Rio Grande LNG....................42

1.      Port Arthur LNG failed to consider using Dry Low $NO_x$ burners to control $NO_x$ to a limit of 5 ppm. ...........................................42

2.      Port Arthur LNG failed to consider using best combustion practices to control CO to a limit of 15 ppm. ...........................45

3.      A legally sufficient BACT analysis must include the lower $NO_x$ and CO limits permitted at Rio Grande LNG. ..........................47

C.      The Commission's finding that Rio Grande LNG's permitted limits are not "achievable" was invalid, arbitrary, or unreasonable. .................48

1.      TCEQ is required to include recently issued/approved permits in its Federal BACT analysis. .......................................................49

2.      EPA similarly requires TCEQ to consider BACT limits in recently issued/approved permits as achievable in the absence of a compelling showing otherwise...............................................52

3.      TCEQ mischaracterized EPA policy and ignored EPA's specific guidance on this Permit............................................................55

CONCLUSION ........................................................................................58

CERTIFICATE OF SERVICE .................................................................61

CERTIFICATE OF COMPLIANCE........................................................62

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Envtl. Conservation v. EPA,*
    540 U.S. 461 (2004) .................................................................... 39, 40

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
    627 F.3d 547 (5th Cir. 2010) ...................................................................33

*City of Quincy, Mass. v. Mass. Dep't of Envtl. Prot.,*
    21 F.4th 8 (1st Cir. 2021) ..................................................................6, 39

*Cmtys. For a Better Env't v. Cenco Ref. Co.,*
    180 F. Supp. 2d 1062 (C.D. Cal. 2001)........................................................ 22, 28

*Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.,*
    686 F. Supp. 2d 663 (E.D. La 2010) ......................................... 22, 25, 28, 31, 34

*Cornerstone Christian Schs. v. Univ. Interscholastic League,*
    563 F.3d 127 (5th Cir. 2009).....................................................................33

*Ecological Rights Found. v. Pac. Lumber Co.,*
    230 F.3d 1141 (9th Cir. 2000)..................................................................26

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,*
    47 F.4th 408 (5th Cir. 2022)................................................................ 28, 29

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,*
    968 F.3d 357 (5th Cir. 2020)............................................................ 28, 29, 30

*Friends of Buckingham v. State Air Pollution Control Bd.,*
    947 F.3d 68 (4th Cir. 2020)......................................................................6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) .................................................................... 21, 26

*Gerst v. Nixon,*
    411 S.W.2d 350 (Tex. 1966) ...............................................................19

*Gulf Restoration Network v. Salazar,*
    683 F.3d 158 (5th Cir. 2012).................................................... 20, 32, 34

*Hall v. Norton,*
  266 F.3d 969 (9th Cir. 2001) ......................................................... 22, 25

*Hunt v. Wash. State Apple Adver. Comm'n,*
  432 U.S. 333 (1977) ........................................................ 20, 32, 33, 34

*In re Columbia Gulf Transmission Co.,*
  2 E.A.D. 824 (Adm'r 1989) ....................................................................41

*In re Masonite Corp.,*
  5 E.A.D. 551 (EAB 1994) .......................................................................40

*In re Pennsauken Cnty., N.J., Res. Recovery Facility,*
  2 E.A.D. 667 (Adm'r 1988)....................................................................40

*Int'l Union, UAW v. Brock,*
  477 U.S. 274 (1986) ...............................................................................33

*Kawasaki Motors Corp. v. Tex. Motor Vehicle Comm'n,*
  855 S.W.2d 792 (Tex. App.—Austin 1993, no pet.) ............................19

*LaFleur v. Whitman,*
  300 F.3d 256 (2d Cir. 2002) ..................................................................28

*Phillips Petroleum v. Tex. Comm'n on Envtl. Quality,*
  121 S.W.3d 502 (Tex. App—Austin 2003, no pet.)..............................19

*Public Int. Rsch. Grp. of N.J. v. Powell Duffryn Terminals, Inc.,*
  913 F.2d 64 (3d Cir. 1990) ............................................................. 26, 27

*R.R. Comm'n of Tex. v. Shell Oil Co.,*
  139 Tex. 66, 161 S.W.2d 1022 (1942) ..................................................19

*Save our Cmty. v. U.S. EPA,*
  971 F.2d 1155 (5th Cir. 1992) ........................................................ 28, 30

*Save our Wetlands, Inc. v. Sands,*
  711 F.2d 634 (5th Cir. 1983) .................................................................32

*Shrimpers and Fisherman of RGV v. Tex. Comm'n on Envtl. Quality,*
  968 F.3d 419 (5th Cir. 2020) .................................................................21

*Sierra Club v. Franklin Cnty. Power of Ill., LLC,*
546 F.3d 918 (7th Cir. 2008) .......................................................... 28, 30

*Sierra Club v. Tenn. Valley Auth.,*
430 F.3d 1337 (11th Cir. 2005) ...........................................................25

*Sierra Club v. Tri-State Generation and Transmission Ass'n, Inc.,*
173 F.R.D 275 (D. Colo. 1997) ............................................................22

*Sierra Club v. U.S. Dept of Interior,*
899 F. 3d 260 (4th Cir. 2018) ...............................................................7

*Slay v. Texas Comm'n on Envtl. Quality,*
351 S.W.3d 532 (Tex. App.—Austin 2011, pet. denied)....................19

*Smith v. Houston Chem. Servs., Inc.,*
872 S.W.2d 252 (Tex. App.—Austin 1994, writ withdrawn);............18

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ............................................................................21

*St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., LLC,*
354 F. Supp. 2d 697 (E.D. La. 2005) ...................................................28

*Starr Ctny. v. Starr Indus. Servs., Inc.,*
584 S.W.2d 352 (Tex. App.—Austin 1979, writ ref'd. n.r.e.)............19

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ............................................................................20

*Tex. Campaign for the Env't v. Lower Colo. River Auth.,*
No. 4:11-cv-791, 2012 WL 1067211 (S.D. Tex. Mar. 28, 2012) ........22

*Tex. Health Facilities Comm'n v. Charter Med.–Dallas, Inc.*
665 S.W.2d 446 (Tex. 1984) ...............................................................19

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.,*
207 F.3d 789 (5th Cir. 2000) ...............................................................22

*Twp. of Bordentown v. FERC,*
903 F.3d 234 (3d Cir. 2018) ........................................................... 18, 19

*United Copper Indus., Inc. v. Grissom,*
  17 S.W.3d 797 (Tex. App—Austin 2000, pet. dism'd) ................................. 18, 19

*United Food and Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
  517 U.S. 544 (1996) ...................................................................................... 31, 33

**Statutes**

15 U.S.C. § 717b (2005) ..........................................................................................6

15 U.S.C. § 717r(d)(1)(2005) ..................................................................................6

30 TEX. ADMIN CODE § 116.160 (1993) ..................................................................9

30 TEX. ADMIN CODE § 116.160(c)(1)(A) (1993) ...............................................9, 39

30 TEX. ADMIN. CODE § 116.111(a)(2) (1998) .......................................................36

30 TEX. ADMIN. CODE § 116.111(a)(2)(C) (1998) ............................................ 38, 46

30 TEX. ADMIN. CODE § 116.160(c)(2) (1993) .......................................................38

30 TEX. ADMIN. CODE § 80.17(a) (1996) ................................................................58

30 TEX. ADMIN. CODE § 80.272(e)(1) (1999) .........................................................13

42 U.S.C. § 7401, *et. seq.* (1967) ..........................................................................6

42 U.S.C. § 7410(a)(2)(A) (1955) .........................................................................38

42 U.S.C. § 7475(a)(4) (1977) ...........................................................................9, 36

TEX. GOV'T CODE § 2001.174 (1993) .....................................................................18

TEX. GOV'T CODE § 2001.174(2) (1993) .................................................................18

TEX. HEALTH & SAFETY CODE § 382.032(e) (1989) ...............................................18

TEX. HEALTH & SAFETY CODE § 382.051(a) (1989) ................................................6

TEX. HEALTH & SAFETY CODE § 382.0518(b)(1) (1991) .........................................9

TEX. HEALTH & SAFETY CODE § 382.0518(d) (1991) ............................................46

U.S. CONST. art III, § 2, cl. 1 .................................................................................20

**Regulations**

40 C.F.R. § 51.166(b)(12) (1978) ................................................. 9, 11, 16, 17, 36, 38

40 C.F.R. § 52.21(b)(1) (1978) ...................................................................................9

40 C.F.R. § 52.21(b)(12) (1978) ............................... 9, 11, 16, 17, 36, 37, 38, 39, 57

40 C.F.R. § 52.2270 *et seq.* (1999) ....................................................................9, 38

54 Fed. Reg. 52,823 (Dec. 22, 1989) ..................................................................9, 38

**Other Authorities**

S. Rep. No. 95-127 (1977) .................................................................................. 37, 38

U.S. EPA Policy Memorandum on BACT Determinations (April 23, 1987) .........41

# JURISDICTIONAL STATEMENT

Respondent TCEQ is an administrative state agency authorized to review and issue air quality permits pursuant to the Federal Clean Air Act. 42 U.S.C. § 7401, *et. seq.* (1967); TEX. HEALTH & SAFETY CODE § 382.051(a) (1989). This petition for review concerns an order issuing an air permit for the construction of a liquified natural gas ("LNG") export facility owned by Port Arthur, LNG, LLC ("Port Arthur LNG").[2]

This Court has "original and exclusive jurisdiction" over "any civil action for the review of an order or action of a... State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval… required under Federal law" of a natural gas facility. 15 U.S.C. § 717r(d)(1) (2005); 15 U.S.C. § 717b (2005). Because TCEQ's Final Order concerns permitting of a natural gas facility, in this case, a liquefied natural gas export facility, it is subject to review by this Court. *See City of Quincy, Mass. v. Mass. Dep't of Envtl. Prot.,* 21 F.4th 8, 13-14 (1st Cir. 2021) (finding court of appeals had original jurisdiction over petition for review of air permit for a natural gas compressor station issued by state agency); *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 80 (4th Cir. 2020)(same).

---

[2] ROA.6355-74.

TCEQ signed the order on September 15, 2022 (the "Final Order"),[3] and PACAN filed this Petition for Review twenty-nine (29) days later on October 14, 2022,[4] within the applicable statute of limitations. *Sierra Club v. U.S. Dept of Interior*, 899 F.3d 260, 268 (4th Cir. 2018).

---

[3] ROA.6374.
[4] ROA.24423-58.

# STATEMENT OF THE ISSUES

1.    TCEQ issued a permit authorizing the construction of the Port Arthur LNG liquefied natural gas export terminal despite the agency's failure to follow applicable Federal law regarding the permitting requirements for new sources of air pollution. Was TCEQ's Final Order issuing the air permit invalid, arbitrary, or unreasonable?

# STATEMENT OF THE CASE

Port Arthur LNG proposes to build a large liquefied natural gas export facility near Port Arthur in Jefferson County, Texas.[5] This case concerns the maximum emission limits for certain pollutants, or how much air pollution Port Arthur LNG should be allowed to release into Port Arthur's air every year for the lifetime of the facility. Once built, Port Arthur LNG would emit thousands of tons of air pollution each year, much of which would consist of nitrogen oxides ("$NO_x$") and carbon monoxide ("CO") from eight gas-fired refrigeration compression turbines (herein "the turbines") which refrigerate and compress natural gas prior to being exported.[6]

"Major stationary source[s]"—sources which will release into the air more than 250 tons per year of a regulated pollutant—in areas such as Port Arthur, Texas, must obtain what is known as Prevention of Significant Deterioration ("PSD")

_____

[5] ROA.948.
[6] ROA.969.

8

permit prior to construction. 40 C.F.R. § 52.21(b)(1) (1978). Texas has received EPA's approval, through a State Implementation Plan, to implement the PSD air permit program within the State of Texas. 40 C.F.R. § 52.2270 *et seq.* (1999)(Part 52 Subpart SS); 54 Fed. Reg. 52,823 (Dec. 22, 1989); 30 TEX. ADMIN CODE § 116.160 (1993).

As a precondition to receiving a PSD permit, applicants must demonstrate that their facility meets the "Best Available Control Technology" or "BACT." 42 U.S.C. § 7475(a)(4) (1977); TEX. HEALTH & SAFETY CODE § 382.0518(b)(1) (1991). Federal law requires applicants for PSD permits to apply and adopt Federal BACT, an emission limitation based on *the maximum degree of reduction* achievable for each pollutant, taking into account energy, environmental, and economic impacts and other costs. 40 C.F.R. § 52.21(b)(12) (1978), incorporated by reference at 30 TEX. ADMIN CODE § 116.160(c)(1)(A) (1993) (emphasis added). Every state must adopt this Federal definition of BACT. 40 C.F.R. § 51.166(b)(12) (1978).

Because Port Arthur LNG is a major source in Jefferson County, Texas, the facility must receive a Federal Clean Air Act major source (i.e., PSD) permit from TCEQ prior to commencing construction.[7] In September 2019, Port Arthur LNG filed a PSD permit application seeking authorization to build four natural gas

---

[7] ROA.948-49.

9

liquefaction trains at its planned facility in Port Arthur.[8]  TCEQ issued a draft permit on June 2, 2020,[9] proposing BACT emission limits for the turbines of 9 parts per million ("ppm")[10] for $NO_x$ and 25 ppm for CO.[11]  In response, PACAN filed timely public comments and a hearing request on the draft permit on September 15, 2020.[12]

In August 2021, TCEQ's three Commissioners referred PACAN's hearing request to the State Office of Administrative Hearings.[13]  The Commissioners directed an administrative law judge ("ALJ") to determine if PACAN member John Beard, Jr. had standing and if so, to conduct a full hearing on the merits of the permit application's BACT determinations.[14] Following a preliminary hearing on standing, the ALJ found that PACAN had standing to challenge the permit due to the impacts of Port Arthur LNG's pollution on Mr. Beard.[15] The ALJ then ordered a hearing on the merits of Port Arthur LNG's selection of pollution control technology, among other issues.[16] A second ALJ was added to the case for the merits hearing.[17]

---

[8] ROA.909.

[9] ROA.411-99; ROA.434-35.

[10] "ppmvd" stands for "parts per million by volume, dry". For example, "9 ppmvd" refers to (9 / 1,000,000) x 100 = 0.0009% of the volume of flue gas. The reason they stipulate "dry" is because when the emission is measured, the instrument typically removes all moisture (water) from the sample. The "ref. 15% $O_2$" is required as a benchmark for the oxygen content in the flue gas. The boiler will operate at various $O_2$ levels, and the air district needs to normalize the measurements.

[11] ROA.960; ROA.1071.

[12] ROA.10533.

[13] ROA.13819-21.

[14] ROA.13819-21.

[15] ROA.5145-51.

[16] ROA.5172.

[17] ROA.5665

Following the hearing on the merits,[18] on May 20, 2022, the ALJs issued a Proposal for Decision ("PFD") and Proposed Order.[19] The ALJs found that the record did not support Port Arthur LNG's proposed BACT limits for the turbines.[20] Rather, the ALJs' Proposed Order recommended that the draft permit be amended to reduce emissions limits from the turbines to 5 ppm $NO_x$ and 15 ppm CO.[21] The ALJs explained that the record demonstrated that other permitted LNG export facilities have lower $NO_x$ and CO limits on the same turbines[22] and Port Arthur LNG failed to show why it could not meet those lower limits at its own facility. [23]

After the ALJs issued their Proposal for Decision,[24] but before TCEQ issued its Final Order,[25] U.S. EPA notified TCEQ that the ALJs had correctly applied Federal BACT.[26] EPA warned TCEQ to avoid mischaracterization of EPA's BACT policy on this Port Arthur LNG permit.[27] Specifically, EPA took issue with TCEQ staff (the "Executive Director's") interpretation of the Federal definition of BACT[28]

---

[18] ROA.12900-13693.
[19] ROA.6032-126.
[20] ROA.6032-33.
[21] The PFD proposed "an amendment that requires the refrigeration compressor turbines be permitted with a $NO_x$ emission limit of 5ppmv [and] with a CO emission limit of 15ppmv…". ROA.6125,
[22] ROA.6070; ROA.6115.
[23] ROA.6070; ROA.6073.
[24] ROA.6032-126.
[25] ROA.6355-423.
[26] ROA.24530-34.
[27] ROA.24531-34.
[28] 40 C.F.R. § 52.21(b)(12) (1978); 40 C.F.R. § 51.166(b)(12) (1978).)

and EPA's BACT guidance ("NSR Manual"),[29] a document relied on and referenced by all parties throughout the hearing.[30]

On September 15, 2022, TCEQ Commissioners issued a Final Order overturning portions of the ALJs' Proposal for Decision and issuing Port Arthur LNG's permit without the more stringent, lower, pollution limits recommended by the ALJs on the turbines.[31] Instead of accepting the ALJs' findings that BACT limits for the turbines are 5 ppm $NO_x$ and 15 ppm CO based on evidence at the hearing,[32] the Commission replaced the ALJs' findings with its own[33] and adopted Port Arthur LNG's original proposed limits of 9 ppm $NO_x$ and 25 ppm CO.[34]

Collectively, the turbines are the largest source of pollution at Port Arthur LNG, and the Commission's action here increases the annual pollution from the turbines by over 1,200 tons – 2,400,000 pounds – of air pollution per year.[35]

---

[29] ROA.10658-978.
[30] ROA.24533-34.
[31] ROA.6355-432; ROA.6373.
[32] ROA.6107.
[33] With respect to the emission limits for the turbines, the Commissioners made the following changes: (1) deleted Findings of Fact Nos. 62, 65, 70, 71, 72, 73, 74, 77, 78, and 79 which included evidence of lower emission limits at other permitted LNG facilities; (2) added new Findings of Fact Nos. 64A, 64B, 76A, and 78A to explain the Commission's rejection of limits adopted by Rio Grande LNG and other LNG facilities; (3) deleted Conclusion of Law Nos. 21-25 which restated requirements from the NSR Manual and related TCEQ guidance on BACT; and (4) deleted Conclusion of Law Nos. 26 and 30 regarding the adopted BACT limits for the turbines. ROA.6362-36; ROA.6370-71.
[34] ROA.6372-77.
[35] ROA.6072-74; ROA.6407-09.

On October 10, 2022, PACAN exhausted its administrative remedies by filing a Motion for Rehearing,[36] which was overruled by operation of law after 55 days. 30 TEX. ADMIN. CODE § 80.272(e)(1) (1999).

PACAN now files this appeal challenging the Final Order issued by TCEQ[37] as invalid, arbitrary, or unreasonable because it issued Port Arthur LNG's PSD permit without requiring Federal BACT for $NO_x$ and CO emissions from the eight turbines.

---

[36] ROA.24423-25047.
[37] ROA.6355-423.

# SUMMARY OF THE ARGUMENT

Port Arthur Community Action Network challenges the Final Order[38] entered by TCEQ issuing Air Quality Permit Nos. 158420, PSDTX1572, and GHGPSDTX198[39] to Port Arthur LNG, LLC because the Final Order fails to comply with the Federal Clean Air Act's requirement that new major sources of air pollution install the best available control technology to reduce that pollution.

In both TCEQ and EPA policy and established practice, the essential starting points for determining Federal BACT pollution limits are the pollution limits in recently issued permits for similar sources.[40] And the BACT limits for the new source must be at least as stringent as the most stringent limits in those recent permits.[41] The logic is simple: what other sources have been able to do to control pollution, new applicants like Port Arthur LNG are also expected to do to control pollution. A source can justify a less stringent limit if meeting the most stringent limit is unreasonably expensive or otherwise has unacceptable collateral impacts, but this justification must be well documented in the administrative record and carefully reviewed by the permitting authority.[42]

---

[38] ROA.6355-423.
[39] ROA.909-1422.
[40] ROA.10739; ROA.7249-50.
[41] ROA.10734; ROA.7249-50
[42] ROA.7249-50; ROA.10739.

Here, the Commission issued a permit to Port Arthur[43] that fails to adopt the most stringent limits for Nitrogen Oxides and Carbon Monoxide on its refrigeration compression turbines and fails to justify the less stringent limits.

Undisputed facts in the record show that multiple recent plants of the same type have permitted limits that are significantly more stringent than those at Port Arthur LNG,[44] most notably Rio Grande LNG.[45] While Port Arthur LNG proposes a $NO_x$ limit of 9 ppm using Dry Low $NO_x$ burners and a CO limit of 25 ppm using good combustion practices,[46] Rio Grande LNG was recently issued a permit with a limit of 5 ppm $NO_x$ and 15 ppm CO,[47] using those same control technologies on the same model of turbine in the same configuration and service as Rio Grande LNG.[48]

Port Arthur LNG failed to include these more stringent limits in its BACT analysis and offered no evidence to justify adopting less stringent limits.[49] Following an administrative hearing on this permit,[50] two ALJs found that Port Arthur LNG's BACT analysis was legally deficient for this very reason.[51] The ALJs recommended

---

[43] ROA.6355-423.
[44] ROA.6070; ROA.10569; ROA.13530.
[45] ROA.12880.
[46] ROA.13517-18.
[47] ROA.12880.
[48] ROA.11801; ROA.12880.
[49] ROA.1074-93; ROA.6073.
[50] ROA.12900-13693.
[51] ROA.6032-33.

that the permit be amended to reflect the more stringent pollution limits permitted at Rio Grande LNG and other facilities.[52]

However, instead of adopting the ALJs' recommendation,[53] the Commission issued Port Arthur LNG's permit with the less stringent limits.[54] The Commission wrongly claimed that since Rio Grande LNG and other facilities were not yet operational, that the limits had not been proven to be achievable or technically feasible and did not need to be considered in the BACT analysis.[55]

The Commission's justification is contrary to the Federal definition of BACT[56] and to TCEQ and EPA policy and practice that require review of BACT limits in recently issued permits regardless of whether those facilities are operational or not.[57] Further, TCEQ and EPA policy assume that BACT limits in a recently issued permit are achievable and technically feasible absent a compelling showing to the contrary.[58] And neither Port Arthur LNG nor TCEQ made any such showing.[59]

---

[52] ROA.6125.
[53] ROA.6125.
[54] ROA.6373.
[55] ROA.6372-73.
[56] 40 C.F.R. § 52.21(b)(12) (1978); 40 C.F.R. § 51.166(b)(12) (1978).
[57] ROA.10734-39; ROA.7249.
[58] ROA.7249-50; ROA10737-41.
[59] ROA.6072; ROA 6074.

The Commission ignored the Federal definition of BACT[60] and departed from its own[61]—and EPA's[62]—policy by wrongly dismissing the significantly more stringent pollution limits in the Rio Grande LNG permit.[63] The result is a permit for Port Arthur LNG's turbines that will emit 80% more $NO_x$ and 66% more $CO$[64]— over 1,200 additional tons per year, in all—than the same turbines at Rio Grande LNG.[65] The Commission's Final Order is contrary to law, contrary to long-standing TCEQ and EPA policy and practice,[66] contrary to the ALJs' findings after a lengthy hearing,[67] and contrary to the undisputed facts in the record.

The Commission's Final Order is thus invalid, arbitrary, or unreasonable.

## ARGUMENT

PACAN challenges TCEQ's Final Order issuing the Federal Clean Air Act Prevention of Significant Deterioration Permit for Port Arthur LNG[68] because it fails to meet the *best available control technology* (BACT) standard, as evidenced by other nearly identical facilities with lower emission limits.

---

[60] 40 C.F.R. § 52.21(b)(12) (1978); 40 C.F.R. § 51.166(b)(12) (1978).
[61] ROA.7241-52.
[62] ROA.10733-10807.
[63] ROA.6372-73.
[64] ROA.6107; ROA.6407-09
[65] ROA.12880.
[66] ROA.10734-39; ROA.7249.
[67] ROA.6125.
[68] ROA.6355-423.

## I.   STANDARD OF REVIEW

Under the Natural Gas Act, "[f]ederal courts reviewing state agency action afford the agencies the deference they would receive under state law." *Twp. of Bordentown v. FERC*, 903 F.3d 234, 270 (3d Cir. 2018). Under Texas law, the standard for judicial review of TCEQ's action is whether it is "invalid, arbitrary, or unreasonable." TEX. HEALTH & SAFETY CODE § 382.032(e) (1989); *see United Copper Indus., Inc. v. Grissom*, 17 S.W.3d 797, 801 (Tex. App—Austin 2000, pet. dism'd). This "unusual" standard incorporates the entire scope of review set forth in the Texas Administrative Procedure Act ("APA"). *Grissom*, 17 S.W.3d at 801; *Smith v. Houston Chem. Servs., Inc.*, 872 S.W.2d 252, 279 n.2 (Tex. App.—Austin 1994, writ withdrawn); TEX. GOV'T CODE § 2001.174 (1993). Under this scope of review, the Court must reverse or remand the case if an appellant's rights are prejudiced because of the agency's "findings, inferences, conclusions or decisions are (A) in violation of a… statutory provision, (D) affected by other error of law; (E) not reasonably supported by substantial evidence... or (F) arbitrary or capricious or characterized by abuse of discretion[.]" TEX. GOV'T CODE § 2001.174(2) (1993). These statutory grounds for reversal in the APA are legal questions subject to de novo review. *Grissom*, 17 S.W.3d at 801.

The substantial-evidence rule of Texas jurisprudence considers whether a reasonable basis exists for the agency's action. *Slay v. Texas Comm'n on Envtl.*

*Quality,* 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied). An "arbitrary" agency action includes one made "without regard to the facts" and cannot stand if the administrative order is not reasonably supported by substantial evidence. *See Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966) (quoting *R.R. Comm'n of Tex. v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1029 (1942)). In this respect, lack of substantial evidence and agency arbitrariness have been considered "two sides of the same coin." *See Tex. Health Facilities Comm'n v. Charter Med.–Dallas, Inc.,* 665 S.W.2d 446, 454 (Tex. 1984). However, an agency's decision may be supported by substantial evidence and still be arbitrary and capricious where the agency has not considered all legally relevant factors or considered legally irrelevant factors. *Kawasaki Motors Corp. v. Tex. Motor Vehicle Comm'n,* 855 S.W.2d 792, 795 (Tex. App.—Austin 1993, no pet.); *see Starr Ctny. v. Starr Indus. Servs., Inc.,* 584 S.W.2d 352, 355-56 (Tex. App.—Austin 1979, writ ref'd. n.r.e.).

No deference is owed to the agency's interpretation of a statute or a strictly legal issue. *Twp. of Bordentown*, 903 F.3d at 270. Accordingly, this Circuit does not have to defer to TCEQ's interpretation of the Federal Clean Air Act, which instead this Court reviews de novo. *Id.* These principles are also consistent with the Texas state law, which does not afford deference to TCEQ when its fails to follow its own rules. *Phillips Petroleum v. Tex. Comm'n on Envtl. Quality*, 121 S.W.3d 502, 505 (Tex. App—Austin 2003, no pet.); *see Grissom,* 17 S.W.3d at 801.

19

## II.    PACAN HAS STANDING TO CHALLENGE THIS AIR PERMIT.

PACAN meets Article III standing requirements for an organization to challenge this permit based on the property, health, and recreational interests of John Beard, Jr., who is also PACAN's President and Founder.[69] *See Summers v. Earth Island Inst.,* 555 U.S. 488, 494 (2009) (noting that organizations can establishing standing through a member). As an organizational plaintiff, PACAN must satisfy the *Hunt* test for associational standing under Article III which requires an organization to demonstrate that: (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977); *Gulf Restoration Network v. Salazar,* 683 F.3d 158, 166 (5th Cir. 2012); U.S. CONST. art 3, § 2, cl. 1. The individual members of an organization, like Mr. Beard, have standing to sue in their own right if (1) they have suffered an "injury in fact" that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the respondent; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*

---

[69] ROA.4520.

528 U.S. 167, 180–81 (2000) (internal citations omitted); *Shrimpers and Fisherman of RGV v. Tex. Comm'n on Envtl. Quality,* 968 F.3d 419, 424 (5th Cir. 2020).

### A.    Mr. Beard Has Standing to Sue in His Own Right

Mr. Beard will suffer an injury-in-fact as a result of this permit decision because, as Port Arthur LNG admits, the very pollutants released from Port Arthur LNG will fall on Mr. Beard's home in West Port Arthur.[70] Port Arthur LNG also admits that its pollution will descend into the areas where Mr. Beard recreates on Pleasure Island.[71] In this way, Mr. Beard's injuries are particularized. *See Spokeo, Inc. v. Robins,* 578 U.S. 330, 339 (2016) ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"). That is, the pollution from Port Arthur LNG will injure Mr. Beard in a personal way, in a manner not common to the general public because the pollution will invade his legally protectable property and recreational interests.[72] *Spokeo*, 578 U.S. at 339.

First, Mr. Beard is affected by Port Arthur LNG's pollution because that pollution will directly impact his Port Arthur home.[73] Port Arthur LNG's own witness admitted that Mr. Beard will breathe pollution directly from the proposed facility in his own front yard.[74] *Texans United for a Safe Econ. Educ. Fund v. Crown*

---

[70] ROA.4072; ROA.4523-25.
[71] ROA.4073; ROA.4527-32; ROA.4699-703.
[72] ROA.4523-33; ROA.4538-40; ROA.4558; ROA.4587-89; ROA.4699-703.
[73] ROA.4523-25; ROA.37784-86.
[74] ROA.4072; ROA.4523-25; ROA.4699-702; ROA.37809-10.

*Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000); *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 670-71 (E.D. La 2010); *Cmtys. For a Better Env't v. Cenco Ref. Co.,* 180 F. Supp. 2d 1062, 1075 (C.D. Cal. 2001); *Sierra Club v. Tri-State Generation and Transmission Ass'n, Inc.*, 173 F.R.D 275, 280 (D. Colo. 1997). Specifically, Port Arthur LNG predicted their releases of nitrogen dioxide ("$NO_2$") and dangerous particulate matter ("$PM_{2.5}$") will fall on Mr. Beard's property less than four miles from the proposed facility[75] and at levels large enough to increase his risk of a variety of negative health effects.[76] The additional pollution burden and odors will interfere with Mr. Beard's daily life and will make it harder for him to chat with neighbors in his driveway or enjoy a barbecue with friends and family in his backyard.[77]

Expert testimony also established that Mr. Beard will be at increased risk of adverse health effects from breathing Port Arthur LNG's pollution.[78] *Hall v. Norton,* 266 F.3d 969, 976 (9th Cir. 2001); *Tex. Campaign for the Env't v. Lower Colo. River Auth.,* No. 4:11-cv-791, 2012 WL 1067211 (S.D. Tex. Mar. 28, 2012). Port Arthur LNG admitted that pollution from its new facility will cause increases in the concentrations of at least two air pollutants at Mr. Beard's home.[79] Port Arthur LNG

---

[75] ROA.4523-24; ROA.4606; ROA.4534; ROA.37616-18.
[76] ROA.4532-33.
[77] ROA.4524; ROA.4539-40.
[78] ROA.4532-33; ROA.4538-40; ROA.37613-16.
[79] ROA.4558; ROA.4702.

estimates that its pollution will cause an increase at Mr. Beard's property of 9.7 micrograms per cubic meter ("µg/m³")[80] of $NO_2$, and 0.3 µg/m³ of $PM_{2.5}$.[81] This fact alone sets Mr. Beard apart from the general public. By Port Arthur LNG's own admission, pollution from its facility will reach Mr. Beard's residence,[82] where it has the potential to interfere with his use and enjoyment of his property.[83] Port Arthur LNG's area of impact is large, and, critically, includes Mr. Beard's home.[84] Thus, Mr. Beard is affected in a manner different from an individual in Dallas, Austin, or El Paso.

Respondent Niermann, TCEQ Chairman, expressly acknowledged that Port Arthur LNG's impacts to the areas where Mr. Beard lives and recreates are "not trivial."[85] PACAN's experts, Dr. Loren Hopkins, Chief Environmental Science Officer, Bureau Chief of Community and Children's Environmental Health, City of Houston Health Department,[86] and Dr. Peter DeCarlo, a professor of environmental health and engineering at John Hopkins University,[87] agree: the level of $NO_2$ that

---

[80] Micrograms per cubic meter or "µg/m³" means one millionth (10-6) of a gram of a contaminant per cubic meter of ambient air, as measured and determined by the methods prescribed for that contaminant.
[81] ROA.4539; ROA.4558; ROA.4702.
[82] ROA.4558; ROA.4702.
[83] ROA.4523-26; ROA.4538-40; ROA.4558-60; ROA.4587-89.
[84] ROA.4702; ROA.4534.
[85] ROA.4606.
[86] ROA.4540; ROA.37751-52.
[87] ROA.37701-02; ROA.4072.

Port Arthur LNG admits will fall at Mr. Beard's home exceeds what EPA and TCEQ refer to as the "Significant Impact Level" of 7.5 $\mu g/m^3$.[88]

Port Arthur LNG's admitted impacts on Mr. Beard's property of 9.7 $\mu g/m^3$ of $NO_2$ and 0.3 $\mu g/m^3$ of $PM_{2.5}$ increase his risk of negative health effects.[89] $NO_2$ is a potent air pollutant that can cause a variety of adverse respiratory health effects.[90] Studies have shown that $NO_2$ can cause harm to humans and increase their risk of health effects even at low levels.[91] Even small increases in $NO_2$ levels—smaller than the 9.7 $\mu g/m^3$ that Port Arthur LNG modeled[92]—result in increased risks to humans of the health effects mentioned above.[93]

$PM_{2.5}$ is made up of microscopic particles that can penetrate deep into the lungs and enter the bloodstream, causing a range of negative respiratory and cardiac effects.[94] There is a large body of evidence that there is no safe level of $PM_{2.5}$.[95] Any increase in $PM_{2.5}$ levels—including the 0.3 $\mu g/m^3$ that Port Arthur LNG admits will land on Mr. Beard's house[96]—increases the risk to people.[97]

---

[88] ROA.7032; ROA.4700-02.
[89] ROA.4072; ROA.4532-33; ROA.4538-39.
[90] ROA.4539; ROA.37724; ROA.37636-37.
[91] ROA.4539; ROA.37724.
[92] ROA.4702.
[93] ROA.4539; ROA.37725-27.
[94] ROA.4539; ROA.37725.
[95] ROA.4540; ROA.37727-28.
[96] ROA.4702.
[97] ROA.4540; ROA.37728.

Mr. Beard's injury is concrete and particularized because his respiratory discomfort will be aggravated by Port Arthur LNG's pollution at his home.[98] *Hall,* 266 F.3d at 976. Port Arthur LNG's admitted ground-level pollution increases of 0.3 $\mu g/m^3$ of $PM_{2.5}$ and 9.7 $\mu g/m^3$ of $NO_2$[99] will contribute to Mr. Beard's risk of negative health effects.[100]  Mr. Beard already experiences some of the above symptoms in response to air pollution from other industrial sources in Port Arthur, including difficulty breathing, scratchy throat, and headaches.[101] Mr. Beard also has decreased lung capacity and takes medication for a heart rhythm problem.[102] Both conditions make him more susceptible to health issues from air pollution.[103] Accordingly, Mr. Beard has reasonable concerns about the health effects of the pollution he will be breathing.[104] *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1345 (11th Cir. 2005); *Murphy Oil*, 686 F. Supp. 2d at 671. Reasonable concerns about the effects of pollution and its direct effects on his recreational interests are sufficient to show injury; PACAN does not have to show that Mr. Beard will suffer adverse health impacts because of the proposed pollution. *Murphy Oil*, 686 F. Supp. 2d at 671. Mr.

---

[98] ROA.4523-27; ROA.4532-33.
[99] ROA.4702.
[100] ROA.4540.
[101] ROA.4532.
[102] ROA.4532-33.
[103] ROA.37753.
[104] ROA.37754-55.

Beard fears that the increased pollution burden from Port Arthur LNG will worsen his symptoms and cause additional adverse effects.[105]

In addition to posing a direct threat to Mr. Beard's property interests, Port Arthur LNG's pollution will also adversely affect his recreational activities.[106] *Laidlaw*, 528 U.S. at 181–84; *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1150 (9th Cir. 2000); *Public Int. Rsch. Grp. of N.J. v. Powell Duffryn Terminals Inc,* 913 F.2d 64, 71 (3d Cir. 1990). In addition to increasing pollution levels at Mr. Beard's home, Port Arthur LNG also admitted that its pollution will reach two locations on Pleasure Island, an 18.5 mile-long island that hugs the coast of Port Arthur[107]—Riverfront Park and Walter Umphrey State Park.[108] The pollution increases at these two parks are even higher than the increase Port Arthur LNG admits at Mr. Beard's home.[109] Specifically, Port Arthur LNG admits it will increase pollution levels at Riverfront Park property by 10.9 $\mu g/m^3$ of $NO_2$ for the 1-hour standard, and 0.34 $\mu g/m^3$ of $PM_{2.5}$ for the 24-hour standard.[110] At Walter Umphrey State Park, Port Arthur LNG admits it will increase pollution levels by 10.6 $\mu g/m^3$ of $NO_2$ for the 1-hour standard, and 0.29 $\mu g/m^3$ of $PM_{2.5}$ for the 24-hour standard.[111]

---

[105] ROA.4532-33.
[106] ROA.4527-32.
[107] ROA.37769.
[108] ROA.4702-4703; ROA.37771-72.
[109] ROA.4703; ROA.37701-02; ROA.37711.
[110] ROA.4703.
[111] ROA.4703.

Again, these $NO_2$ increases exceed EPA and TCEQ's "Significant Impacts Level" of 7.5 µg/m³.[112]

Mr. Beard engages in recreational activities at these two parks and at other locations on and near Pleasure Island, which is directly across S. Gulf Freeway from Port Arthur LNG and less than 900 feet away.[113] Specifically, Mr. Beard likes to sightsee, fish, bird watch, picnic, boat, and attend special events with family and friends on Pleasure Island, including participating in activities at and near Riverfront Park, Lakefront Park, and Walter Umphrey State Park.[114] In addition to recreating at Pleasure Island, Mr. Beard also fishes at Keith Lake Cut, which shares a fenceline with Port Arthur LNG.[115] The pollution increases that Port Arthur LNG predicts at these locations near Pleasure Island are significant enough to increase the risk that Mr. Beard will experience negative health effects.[116] Mr. Beard is concerned that he will have to curtail his recreational activities on Pleasure Island if Port Arthur LNG is allowed to emit thousands of tons per year of toxic air pollutants.[117] Any "identifiable trifle" of interference with aesthetic and recreational interests is sufficient to confer standing. *Public Int. Rsch. Grp. of N.J.,* 913 F.2d at 72.

---

[112] ROA.7032.
[113] ROA.4534; ROA. 4606; ROA.4527; ROA.37623-27.
[114] ROA.4527-32; ROA.37627-29.
[115] ROA.4527-32; ROA.37772; ROA.37631-33; ROA.37764-66; ROA.6701.
[116] ROA.4538-40.
[117] ROA.4532.

These concrete harms threatening Mr. Beard's property interests and recreational interests and creating reasonable concerns for his health – justified by Port Arthur LNG's admission of the pollution levels it will create at his house and on Pleasure Island – are the basis of Mr. Beard's standing. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,* 47 F.4th 408, 416 (5th Cir. 2022) (citing *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 368 (5th Cir. 2020)) (explaining the injuries suffered by the plaintiffs—interference with recreation, breathing and smelling polluted air, and allergy-like or respiratory problems—are concrete harms that have long been a basis for constitutional standing). Concerns about the health effects of pollution need not be accompanied by physical symptoms of harm, *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., LLC,* 354 F. Supp. 2d 697, 702 (E.D. La. 2005), or supported by medical testimony. *Id.; Murphy Oil*, 686 F. Supp. 2d at 671; *Cenco*, 180 F. Supp. 2d at 1075. Nor do emissions need to cause the ambient levels of air pollutants to exceed regulatory limits for a person to suffer an injury in fact.[118] *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir. 2008); *LaFleur v. Whitman,* 300 F.3d 256, 270–71 (2d Cir. 2002). Nor do they require proof to a scientific certainty that the proposed facility will be the only cause of the precise harm suffered or feared. *Save our Cmty. v. U.S. EPA,* 971 F.2d 1155, 1161 (5th Cir. 1992). As PACAN's experts' testimony indicates, the

---

[118] ROA.37822-23; ROA.37840-41; ROA.37859-60.

pollution increases from Port Arthur LNG will be "sizeable"[119] or "significant",[120] will be "harmful",[121] will "negatively impact" Mr. Beard at his home,[122] and further, are likely underestimated by Port Arthur LNG's modeling.[123]

Mr. Beard's injuries are fairly traceable to the air quality permit at the heart of this dispute because the pollution from Port Arthur LNG will cause or contribute to Mr. Beard's injuries. *Env't Tex. Citizen Lobby,* 968 F.3d at 368. The pollution emitted from Port Arthur LNG will interfere with Mr. Beard's use and enjoyment of his home and the places where he recreates because there is a specific geographic and causal nexus between the pollution and Mr. Beard's residence (under 4 miles)[124] and Pleasure Island (900 feet).[125] Port Arthur LNG admitted that Mr. Beard will be breathing its pollution at his home and on Pleasure Island at levels that exceed regulatory Significant Impact Levels.[126] *Env't Tex. Citizen Lobby,* 968 F.3d at 368; *see also Env't Tex. Citizen Lobby,* 47 F.4th at 417 (explaining that traceability requires less of a causal connection than tort law). Moreover, expert analysis of Port Arthur LNG's admitted pollution levels demonstrated that its pollution is likely to

---

[119] ROA.37701-04.
[120] ROA.4558; ROA.37673-74; ROA.37701-04.
[121] ROA.4538-40.
[122] ROA.4588; ROA.4540; ROA.37651-51; ROA.37687-92; ROA.37692-93; ROA.37712-14.
[123] ROA.37651-57; ROA.37662-63; ROA.37669-70; ROA.37681-82; ROA.37717-18; ROA.3718-19.
[124] ROA.4523-24; ROA.4606; ROA.4534.
[125] ROA.4606; ROA.4534; ROA.4527.
[126] ROA.4700-03; ROA.37838-40.

increase Mr. Beard's risk of adverse health effects.[127] The evidence in the record goes far beyond that needed to establish Article III traceability. *Env't Tex. Citizen Lobby,* 968 F.3d at 368 (explaining traceability requires something more than conjecture but less than certainty).

This Court can redress Mr. Beard's injuries. The redressability factor concerns the connection between the plaintiff's injury and the judicial relief sought. *Save our Cmty.,* 971 F.2d at 1161. PACAN seeks an order either overturning TCEQ's Final Order issuing Port Arthur LNG's air quality permit or remanding said permit to TCEQ for processing in accordance with the ALJs' Proposal for Decision.[128] A favorable ruling from this Court would reduce the specific pollution impacts discussed above. *Env't Tex. Citizen Lobby,* 968 F.3d at 371-72 (explaining that redressability only requires a plaintiff to show that reductions in pollution either in frequency or magnitude are possible). Even if Port Arthur LNG will still emit some pollutants under a modified permit, PACAN's concerns will be addressed by more stringent emission limits on the refrigeration compressor turbines. *Sierra Club,* 546 F.3d at 928. Here, if this Court adopts the limits reflected in the ALJs' Proposal for

---

[127] ROA.4532-33; ROA.4538-40; ROA.37613-16.
[128] Petition for Expedited Review at 1.

Decision[129] in accordance with the Federal definition of BACT,[130] there will be up to 1,259 fewer tons of air pollution emitted into the Port Arthur air each year.[131]

### B.    PACAN's Interests in this Matter are Germane to its Purpose.

The germaneness requirement helps ensure that an association, through its goals and purposes, will have a sufficient interest in the outcome of the litigation to serve as the respondent's natural adversary. *Murphy Oil,* 686 F. Supp. 2d at 673-74 (citing *United Food and Com. Workers Union Loc. 751 v. Brown Grp., Inc*., 517 U.S. 544, 555-56 (1996)). The interests PACAN seeks to protect, including air quality and the environment in Port Arthur, are germane to the organization's purpose.

PACAN is a not-for-profit community-based organization in Port Arthur, Texas[132] that mobilized immediately after Hurricane Harvey to address a slew of environmental releases and problems associated with the storm.[133] The organization is currently active in reviewing and challenging new air permit applications in the area that would compound the already existing issues with air and water quality in the City.[134] PACAN is committed to residents of the City of Port Arthur and remains concerned about the impacts that new, additional pollution sources may have on its

---

[129] ROA.6125.
[130] ROA.24530-34.
[131] ROA.6072-74; ROA.6407-09.
[132] ROA.37606-07.
[133] ROA.4520.
[134] ROA.4520.

residents.[135] For example, with respect to this proposed LNG facility, PACAN submitted written comments to TCEQ regarding the proposed permit[136] and attended at least one public meeting about the facility[137] to raise concerns about increases in air pollution because the application did not comply with the Clean Air Act.[138] PACAN advocates for solutions that reduce or eliminate environmental and public health hazards and improve quality of life for low-income residents in the City of Port Arthur,[139] and PACAN and its members have a significant interest in ensuring that any air permit issued for Port Arthur LNG's proposed facility in the Port Arthur area complies with all applicable statutory and regulatory requirements.[140] PACAN's members have concerns about the health and safety risks posed by increased air pollution and the risk of accidents or explosions from the proposed LNG terminal.[141] This Court has found similar evidence supports associational standing to satisfy this second prong of *Hunt*. *Gulf Restoration Network,* 683 F.3d at 168 (finding organization used litigation and advocacy to support environmental causes); *Save our Wetlands, Inc. v. Sands,* 711 F.2d 634 (5th Cir. 1983) (environmental advocacy organization).

---

[135] ROA.4520.
[136] ROA.4522-23; ROA.13699-729.
[137] ROA.4522.
[138] ROA.13710-14.
[139] ROA.4521; ROA.37609-10.
[140] ROA.4521.
[141] ROA.4521.

### C.    This Challenge Does Not Require Individual Participation

The third prong of the *Hunt* test focuses importantly on "matters of administrative convenience and efficiency." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,* 627 F.3d 547, 551 (5th Cir. 2010). Courts assess this prong by examining both the relief requested and the claims asserted. *Cornerstone Christian Schs. v. Univ. Interscholastic League,* 563 F.3d 127, 134 n.5 (5th Cir. 2009). Only a case-specific analysis will reveal whether an association or its individual members are better positioned to present a case. *Tex. Med. Bd.,* 627 F.3d at 552 (citing *Int'l Union, UAW v. Brock,* 477 U.S. 274, 289–90 (1986)). This prong tries to avoid cases in which the fact and extent of the injury requires members to submit individualized proof. *Brown Grp., Inc.,* 517 U.S. at 555-56.

Here, PACAN seeks judicial review of TCEQ's issuance of the Port Arthur LNG's permit based on its failure to comply with the Federal Clean Air Act and requests this Court's remand of the permit to the agency for reconsideration consistent with the Federal definition of BACT.[142] Because PACAN's claims relate to TCEQ's failure to follow Federal law in determining emission limits for a major source of air pollution, the violation of Federal law will be proved as to all. *Tex. Med. Bd.,* 627 F.3d at 552. Neither the claim asserted nor the relief requested requires the participation of individual members in this case or individual proof of damages

---

[142] Petition for Expedited Review at 1.

from Mr. Beard or any other PACAN members. *See Murphy Oil,* 686 F. Supp. 2d at 678. The claims are not particular to any individual. *Gulf Restoration Network,* 663 F.3d at 168. Nor does the relief require individualized proof. *Id.* Instead, the claims can be resolved in a group context. *Hunt,* 432 U.S. at 344.

Thus, PACAN has standing to challenge TCEQ's Final Order issuing this permit.

## III.  TCEQ'S FINAL ORDER ISSUING THE PERMIT WAS INVALID, ARBITRARY, OR UNREASONABLE

The Commission's Final Order issuing Port Arthur LNG's permit and overruling the Proposal for Decision and Proposed Order on BACT for the refrigeration compression turbines is invalid, arbitrary, or unreasonable.

Following a lengthy evidentiary hearing, the ALJs found that Port Arthur LNG failed to propose legally adequate pollution controls for the refrigeration compression turbines at its facility.[143] Based on the evidence of comparable LNG facilities with lower pollution limits presented at the hearing,[144] the ALJs found that the Best Available Control Technology for the turbines at Port Arthur LNG can achieve limits of 5 ppm $NO_x$ and 15 ppm CO, compared to Port Arthur LNG's less stringent proposed limits of 9 ppm $NO_x$ and 25 ppm CO.[145]

---

[143] ROA.6072-74; ROA.6115-16.
[144] ROA.12900-13693; ROA.5849-50.
[145] ROA.12900-13693; ROA.5849-50.

| Port Arthur LNG Permit | NO$_x$ Limit for Turbines | CO Limit for Turbines | Record |
|---|---|---|---|
| ALJ PFD | 5 ppmvd at 15% O$_2$ | 15 ppmvd at 15% O$_2$ | ROA.6107. |
| TCEQ Final Order | 9 ppmvd at 15% O$_2$ | 25 ppmvd at 15% O$_2$ | ROA.6444-45. |

Adopting BACT for the turbines would reduce total emissions from Port Arthur LNG by 1,259 tons per year.

| Port Arthur LNG Permit | NO$_x$ Emissions from Turbines | CO Emissions from Turbines | Record |
|---|---|---|---|
| ALJ PFD | 620 tons per year | 1,145 tons per year | ROA.6072-74. |
| TCEQ Final Order | 1,117 tons per year | 1,907 tons per year | ROA.6407-09. |

The Commission disregarded the ALJs' findings and issued Port Arthur LNG's permit with higher pollution limits based on its misapplication of Federal law, mischaracterization of EPA and TCEQ guidance, and failure to follow established EPA and TCEQ policy and practice. The Commission wrongly claimed that the lower limits at those comparable LNG plants did not need to be considered when selecting BACT because they had not been shown to be "achievable."[146] In making this finding, the Commission contradicted well-established TCEQ and EPA policy and practice that recently permitted limits at a similar source are considered

---

[146] ROA.6372-73.

achievable and technically feasible absent a compelling showing otherwise.[147] The Commission further ignored EPA's specific comments on this exact point, including a EPA's warning that TCEQ staff were mischaracterizing BACT policy.[148]

For the reasons explained below, the Commission's Final Order is contrary to the Federal definition of BACT[149] and an invalid, arbitrary, or unreasonable departure from established TCEQ and EPA policy. Additionally, the Final Order contradicts and is unsupported by the evidence in the record.

### A. The Federal Clean Air Act Defines Best Available Control Technology, Not TCEQ.

According to the Clean Air Act, before an air quality permit may be issued for a major source, "Best Available Control Technology (BACT) must be evaluated for and applied to all facilities." 42 U.S.C. § 7475(a)(4) (1977).

For facilities subject to the Federal major source (i.e., PSD) permitting program,[150] like Port Arthur LNG, the Federal definition of BACT at 40 C.F.R. § 52.21(b)(12) (1978) applies. "Best Available Control Technology" is defined as follows:

---

[147] ROA.37609-10.

[148] ROA.24530-34; ROA.10739.

[149] 40 C.F.R. § 52.21(b)(12) (1978); 40 C.F.R. § 51.166(b)(12) (1978).

[150] "All facilities with pollutants subject to regulation under the Federal Clean Air Act (FCAA), Title I, Part C shall evaluate and apply BACT as defined in §116.160(c)(1)(A) of this title (relating to Prevention of Significant Deterioration Requirements)." 30 Tex. Admin. Code § 116.111(a)(2) (1998).

> [BACT is] an *emissions limitation* (including a visible emissions standard) based on the *maximum degree of reduction* for each pollutant subject to regulation under the [Clean Air] Act which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 C.F.R. parts 60 and 61. . .

40 C.F.R. § 52.21(b)(12) (1978) (emphasis added).

BACT requires a comprehensive analysis of all potentially available emission control measures and mandates that a new source comply with emission limits that correspond to the most effective control measures achievable.[151]

Congress created the BACT concept in order "to minimize emissions." S. Rep. No. 95-127 at 29 (1977). One of the core aims of the 1977 Amendments to the Act was to compel the "rapid adoption of improvements in technology as new sources are built." *Id.* at 18. The BACT program is technology-forcing and intended to become more stringent over time as control technologies improve and new cleaner processes are introduced. *Id.* Congress intended BACT as "[p]ossibly [the] most important" of the 1977 Act's many technology-fostering measures. *Id.* This

---

[151] ROA.10737-41.

technology-forcing philosophy was "fundamental" to Congress's adoption of the BACT requirement and congressional efforts throughout the 1977 amendments "to accentuate technological innovation in the control of air pollutants." *Id.* at 10.

The Clean Air Act allows states to seek approval from EPA to administer their state's Federal (i.e., PSD) permitting program. Approvable state programs must be incorporated into an approved state plan and must "include enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the applicable [Clean Air Act] requirements." 42 U.S.C. § 7410(a)(2)(A) (1955). TCEQ's current regulations and the EPA-approved state plan incorporate by reference the Federal PSD rules including the Federal definition of BACT[152] and Federal rules regarding technology reviews. 54 Fed. Reg. 52,823 (Dec. 22, 1989); *see* 30 Tex. Admin. Code §§ 116.160(c)(2)(A)-(B) (1993); 40 C.F.R. § 52.2270 *et seq.* (1999); *see also* 30 Tex. Admin. Code § 116.111(a)(2)(C) (1998). The Texas state plan also binds Texas to the interpretations and guidance made by EPA with regard to PSD. 54 Fed. Reg. at 52,824. As EPA stated when it approved Texas' PSD program, "[A]ction by the EPA to approve this PSD program as part of the [State Implementation Plan] will have the effect of requiring the state to follow EPA's current and future interpretations of the Act's PSD provisions and EPA regulations, as well as EPA's operating policies and guidance...." *Id.* While Texas

---

[152] 40 C.F.R. § 52.21(b)(12) (1978); 40 C.F.R. § 51.166(b)(12) (1978).

implements the PSD program within its borders, Texas "is in fact acting pursuant to the *federal* [Clean Air Act]." *See, e.g., City of Quincy,* 21 F.4th at 11 (emphasis added)(explaining the state's role).

To guide applicants and permit reviewers in selecting the correct limits for BACT, EPA and TCEQ have developed differing methodologies. EPA developed a five-step "Top Down" method, and TCEQ developed a Three Tier method. These methods are detailed in EPA's NSR Manual and TCEQ's Air Permit Reviewer Reference Guide, both of which Port Arthur LNG and TCEQ relied on to determine BACT for the turbines.[153] *See Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, 518 n.7 (2004)(explaining applicants may use either method; the law does not dictate a particular method).

While the two methods differ in their approaches, both methods should reach the same conclusion.[154] Both methods should arrive at a BACT emission limit based on the *maximum degree of reduction* for each pollutant which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for the source. 40 C.F.R. § 52.21(b)(12) (1978) (emphasis added). Both methods require Port Arthur LNG and TCEQ to review recent permits to determine what limits similar sources have

---

[153] ROA.33926-27; ROA.7709; ROA.8679.
[154] ROA.11064.

achieved.[155] Both methods start with the most stringent pollution control limit identified in recent permits as the assumed BACT limit.[156] And both methods require a thorough, well documented rationale for rejecting the most stringent limit in favor of a less stringent limit.[157] *See Alaska Dep't of Envtl. Conservation,* 540 U.S. at 497 (quoting NSR Manual at B.2 [ROA.10734] to explain that the applicant must provide information on the various control options and, when a less stringent control option is proposed, provide a detailed rationale and supporting documentation for eliminating the more stringent options).

The BACT analysis is one of the most critical elements of the PSD permitting process. As such, it should be well documented in the administrative record.[158] A decision to eliminate potential control options must be adequately explained and justified.[159] *See In re Masonite Corp*., 5 E.A.D. 551, 566 (EAB 1994) (remanding PSD permit decision in part because BACT determination for one emission source was based on an incomplete cost-effectiveness analysis); *In re Pennsauken Cnty., N.J., Res. Recovery Facility*, 2 E.A.D. 667, 672 (Adm'r 1988) (remanding PSD permit decision because "[t]he applicant's BACT analysis * * * does not contain the level of detail and analysis necessary to satisfy the applicant's burden" of showing

---

[155] ROA.10739; ROA.7249.
[156] ROA.10734; ROA.7249-50.
[157] ROA.7249-50; ROA.10739;
[158] ROA.10740-41; ROA.7249-50.
[159] ROA.7249-50; ROA.10739-41.

that a particular control technology is technically or economically unachievable); *In re Columbia Gulf Transmission Co.*, 2 E.A.D. 824, 830 (Adm'r 1989) (permit applicant and permit issuer must provide substantiation when rejecting the most effective technology). The burden of proof is on an applicant to justify why the proposed source is unable to apply the best technology available and is unable to meet the lowest limit for similar sources.[160],[161]

Here, to determine BACT for the turbines, Port Arthur LNG applied both EPA's Top-Down method and TCEQ's Three Tier method.[162] However, as the ALJs concluded, Port Arthur LNG failed to correctly apply either method. Critically, Port Arthur LNG failed to justify why its proposed BACT pollution limits for $NO_x$ and CO were less stringent than limits at other recently permitted facilities, a fundamental requirement of both methods.[163] The Commission erred in overriding the ALJs' findings and accepting Port Arthur LNG's deficient BACT analysis, ignoring the Federal definition of BACT as well as both TCEQ's and EPA's policies and long standing practices.

---

[160] ROA.10753.

[161] *See also* U.S. EPA Policy Memorandum on BACT Determinations at 5 (April 23, 1987), available at https://archive.epa.gov/airquality/ttnnsr01/web/pdf/p8_15.pdf (stating "[t]he burden of proof always rests on the applicant to demonstrate why a generally accepted and established control option is unacceptable for the proposed project.,. . . In most cases, a source simply should not be granted a permit if financing is inadequate for proper controls.").

[162] ROA.1006-1172; ROA.1049.

[163] ROA.7249-50; ROA.10739.

### B.    Port Arthur LNG's BACT analysis was deficient because it failed to consider lower $NO_x$ and CO limits at Rio Grande LNG.

Port Arthur LNG's BACT analysis is deficient for failing to consider the lower $NO_x$ and CO limits permitted at Rio Grande LNG. Rio Grande LNG is a liquified natural gas export terminal using the same GE Frame 7EA turbines in the same refrigeration compression service as proposed for Port Arthur LNG.[164] It is therefore a highly salient comparison for a BACT analysis. And it is undisputed that Rio Grande LNG has permitted limits on its turbines of 5 ppm $NO_x$ using Dry Low $NO_x$ burners and 15 ppm CO using good combustion practices.[165] The Commission erred when it wrongly dismissed these limits.

### 1.    Port Arthur LNG failed to consider using Dry Low $NO_x$ burners to control $NO_x$ to a limit of 5 ppm.

As stated above, Rio Grande LNG uses the same GE Frame 7EA turbines in the same refrigeration compression service as proposed for Port Arthur LNG.[166] Rio Grande LNG has a permitted $NO_x$ limit of 5 ppm on its turbines using Dry Low $NO_x$ burners.[167] The 2020 Rio Grande LNG application includes a vendor guarantee in the form of a "Baker Hughes Gas Turbine Data Sheet" which shows the GE Frame

---

[164] ROA.12880; ROA.11801.
[165] ROA.12880.
[166] ROA.12880; ROA.11801.
[167] ROA.12880; ROA.11801.

7EA turbine is capable of meeting a $NO_x$ emission rate of "less than 5 ppm" using Dry Low $NO_x$ burners.[168]

Dry Low $NO_x$ burners are the same control technology proposed by Port Arthur LNG for use on the same turbines in the same refrigeration compression service at the same type of liquified natural gas export terminal.[169] The critical difference is that Rio Grande LNG is permitted for a significantly lower $NO_x$ limit using that same technology on those same turbines.[170]

As stated above, both EPA and TCEQ BACT methods require reviewing recently approved permits from similar sources—like Rio Grande LNG.[171] And the lowest previously permitted limit for a control technology should be adopted as BACT in the absence of a showing of compelling differences between the proposed source and the previously permitted source.[172] Here, the evidence in the record shows that a limit of 5 ppm $NO_x$ is the lowest previously permitted limit for a GE Frame 7EA in refrigeration compression service at an LNG terminal using Dry Low $NO_x$ burners.[173]

However, Port Arthur LNG wrongly determined that the lowest limit for a GE Frame 7EA in refrigeration compression service using Dry Low $NO_x$ burners was

---

[168] ROA.13524-26.
[169] ROA.12880; ROA.11801; ROA.13517-18.
[170] ROA.12880.
[171] ROA.10734-39; ROA.7249
[172] ROA.10756; ROA.7249-50.
[173] ROA.12880; ROA.13524-26.

9 ppm $NO_x$, over 80% more polluting than the actual lowest permitted limit for Dry Low $NO_x$ burners.[174] Further, Port Arthur LNG failed to show any meaningful difference between its proposed plant and Rio Grande LNG that would explain why it is unable to achieve the lower limit of 5 ppm $NO_x$.[175]

While control technologies can be eliminated from consideration based on collateral impacts, including cost, any such elimination requires a thorough justification in the record, to show why the costs borne by similar plants cannot be borne by the applicant.[176] Here, Port Arthur LNG offered no such evaluation of the 5 ppm limit using Dry Low $NO_x$ burners as permitted at Rio Grande LNG—no cost analysis, no look at collateral impacts.[177]

Because Port Arthur LNG and TCEQ failed to offer any evidence that Port Arthur LNG could not achieve the previously permitted $NO_x$ limit of 5 ppm using Dry Low $NO_x$ burners, that limit must be BACT for the turbines.

Put simply, Port Arthur LNG's failure to either accept the recently permitted lower $NO_x$ limit or demonstrate why it could not achieve that limit is fatal to its BACT analysis. Consequently, the ALJs recommended that Port Arthur LNG's permit limits be revised to reflect the $NO_x$ limit achieved at Rio Grande LNG:[178]

---

[174] ROA.13517-18.
[175] ROA.6072-73.
[176] ROA.10740-41; ROA.10761.
[177] ROA.6070; ROA.6072.
[178] ROA.6072.

The ALJs recommend the Draft Permit be revised to require the Facility to match the limit imposed on both Rio Grande LNG and Golden Pass LNG, both of which are in attainment areas, use GE Frame 7EA turbines, and are permitted to limit $NO_x$ emissions to 5 ppmvd at 15% $O_2$ for the refrigeration compression turbines.

For these reasons, the Court should reject the Final Order and adopt the reasoning in the PFD because Port Arthur LNG failed to consider Dry Low $NO_x$ burners to control $NO_x$ to a limit of 5 ppm.

### 2. Port Arthur LNG failed to consider using best combustion practices to control CO to a limit of 15 ppm.

As stated above, Rio Grande LNG is permitted, using the same GE Frame 7EA turbines in the same refrigeration compression service, with a BACT CO emission limit of 15 ppm achieved through the use of good combustion practices.[179]

In its BACT analysis for CO, Port Arthur LNG admitted that through the use of good combustion practices the range of emission control is as low as 15 ppm CO.[180] Despite acknowledging that good combustion practices were capable of achieving a CO limit of 15 ppm, Port Arthur LNG proposed to use good combustion practices to achieve a CO limit of 25 ppm, over 65% more polluting than other recently permitted sources.[181] The ALJs found that "neither the ED nor Applicant offered additional evidence to demonstrate that there is a compelling technical difference as to why Applicant's CO BACT proposal is less than what has been

---

[179] ROA.12880.
[180] ROA.1089.
[181] ROA.1089; ROA.1092-93.

accepted as BACT in recent permit reviews."[182] Additionally, "[w]hen identifying the BACT determinations for CO for other permitted LNG facilities, Port Arthur LNG failed to identify Rio Grande LNG in its BACT analysis and failed to demonstrate why a CO emission limit of 15 ppm is not BACT for the Facility."[183]

For these reasons, the ALJs found that Port Arthur had failed to conduct a proper BACT analysis: "because Applicant's proposed emission reduction level of 25 ppmvd for CO is not 'at least' equivalent to Rio Grande LNG, which is also located in an attainment area and recently permitted with a BACT CO emission limit of 15 ppmvd through the use of good combustion practices, the third step of the Tier I analysis has not been demonstrated."[184]

The ALJs concluded:[185]

> Because an applicant must include in its application information demonstrating that emissions from the facility will meet the requirements for BACT, with consideration given to the technical practicability and economic reasonableness of reducing or eliminating the emissions from the facility,[186] the Commission may not grant the Draft Permit until such demonstration has been made.[187] Accordingly, the ALJs recommend the Draft Permit be revised to require the Facility to match the limit imposed on Rio Grande LNG—15 ppmvd at 15% $O_2$ through the use of good combustion practices.

---

[182] ROA.6073-74.
[183] ROA.6073; *see* ROA.1092-93.
[184] ROA.6074; ROA.8775.
[185] ROA.6074.
[186] 30 Tex. Admin. Code § 116.111(a)(2)(C) (1998)
[187] Tex. Health & Safety Code § 382.0518(d) (1991).

For these reasons, the Court should reject the Final Order because Port Arthur LNG failed to consider using best combustion practices to limit CO to 15 ppm.

### 3. A legally sufficient BACT analysis must include the lower $NO_x$ and CO limits permitted at Rio Grande LNG.

As described above, the very first step of the BACT analysis is to identify available control technologies by looking at pollution limits in recently issued permits for similar sources.[188] Here, Port Arthur LNG failed to identify the lower $NO_x$ and CO limits at Rio Grande LNG as control technology options for the turbines in its BACT analysis.[189] Further, after PACAN raised this issue at the hearing,[190] Port Arthur LNG failed to offer evidence of any meaningful difference between Rio Grande LNG and its own facility that might explain why Port Arthur LNG could not adopt the lower limits.[191]

These lower, more stringent limits are critical to this dispute because identifying limits and control technology options at similar plants is fundamental to BACT. As discussed above, in determining BACT, the lowest previously permitted limit for a control technology must be considered BACT in the absence of a showing of meaningful differences between the proposed source and the previously permitted

---

[188] ROA.10734-39; ROA.7249.
[189] ROA.1074-93.
[190] ROA.5849-50.
[191] ROA.6074; ROA.6072.

sources.[192] Here, where a similar source has achieved significantly lower permitted limits and Port Arthur LNG has (1) failed to identify that source and its lower limits and (2) failed to show meaningful differences between that source and its proposed plant, BACT must be the lower limits 5 ppm $NO_x$ and 15 ppm CO.[193]

For these reasons, the ALJs rightly recommended that Port Arthur LNG's permit limits be revised to reflect the $NO_x$ and CO limits achieved at Rio Grande LNG.[194]

### C.     The Commission's finding that Rio Grande LNG's permitted limits are not "achievable" was invalid, arbitrary, or unreasonable.

The Commission's decision to overrule the ALJs' recommended emission limits of 5 ppm $NO_x$ and 15 ppm CO for the turbines was invalid, arbitrary, or unreasonable. To justify its determination that BACT for the turbines is 9 ppm $NO_x$ and 25 ppm CO, the Commission stated the lower emission limits recommended by the ALJs did not need to be considered in the BACT analysis because they have not been "demonstrated to be achievable or proven to be in operation, obtainable, and capable for being reached."[195] They stated, wrongly, that the lower limits were not considered "achievable" because comparable LNG facilities in Texas which have adopted lower emission limits "are not in operation and there is no operational data

---

[192] ROA.10756; ROA.7249-50.
[193] ROA.6073-74; ROA.8775.
[194] ROA.6072; ROA 6074.
[195] ROA.6372.

to prove that their permitted limits are achievable at this time."[196] As explained in detail below, the Commission's explanation is contrary to the Federal definition of BACT and contrary to both TCEQ's and EPA's policies and long-standing practices. The Commission's explanation fails to recognize that neither EPA's Top-Down methodology nor TCEQ's Three Tier methodology for determining Federal BACT require emission limits and the associated control technology to be "in operation" and have produced "operational data" before they can be considered achievable.

### 1. TCEQ is required to include recently issued/approved permits in its Federal BACT analysis.

In its Final Order, the Commission acknowledged that Rio Grande LNG has lower $NO_x$ and CO emission limits for its turbines than what the Commission required of Port Arthur LNG.[197]

The Commission goes on to erroneously state that Rio Grande LNG's permit, which the Commission itself has approved, does not provide evidence that its lower emission limits are "achievable."[198] This finding is contrary to the meaning of "achievable" regarding Federal BACT as explained in EPA's NSR Manual[199] and TCEQ's guidance.[200] For the reasons described below, if an emission limit has been

---

[196] ROA.6372; ROA.37508-09.
[197] ROA.37498-99.
[198] ROA.37508.
[199] ROA.10749-53.
[200] ROA.7249.

permitted for a similar source, it must be considered "achievable" absent a compelling showing otherwise.[201]

The Commission's rationale is contrary to its own policy and established procedure for PSD permits. TCEQ's BACT guidance states that for Federal major source (PSD) permits:[202]

> TCEQ uses a three-tier approach to evaluate the BACT proposal in minor NSR air permit applications. EPA has agreed to accept the three-tier approach as equivalent to the top-down method for PSD review when the following are considered:
>
> • Recently issued/approved permits within the state of Texas…

TCEQ's own policy is to consider *recently issued/approved permits*.[203] And TCEQ entirely failed to follow its own policy here.[204] Rio Grande LNG's permit was issued and approved by TCEQ itself in 2020.[205] In 2020, TCEQ found that Rio Grande LNG's pollution limits of 5 ppm $NO_x$ using Dry Low $NO_x$ burners and 15 ppm CO using good combustion practices were BACT.[206] TCEQ found that these limits were technically feasible and achievable on GE Frame 7EA turbines in refrigeration compressor service at a liquefied natural gas export terminal located on the Texas Gulf Coast.[207] It is the very meaning of arbitrary for TCEQ to now claim that those

---

[201] ROA.10750.
[202] ROA.7249. (emphasis original).
[203] ROA.7249. (emphasis added).
[204] ROA.37498-99.
[205] ROA.12880.
[206] ROA.12880.
[207] ROA.12880.

same limits are not technically feasible and achievable on those same turbines in the same service at the same type of facility. TCEQ must adhere to its stated agency philosophy "to apply regulations clearly and consistently amongst permit applicants."[208]

Nowhere in TCEQ's guidance does it say that Federal BACT requires that the comparable facility has been constructed and produced operational data. In fact, the opposite is true—operational data is explicitly not required.[209] TCEQ has fabricated this requirement to reach its desired result.

Further, TCEQ's own policy states that "the BACT selection essentially should default to the highest level of control for which the applicant could not adequately justify its elimination based on energy, environmental, and economic impacts…"[210] And TCEQ requires applicants like Port Arthur LNG to provide a "detailed rationale and supporting documentation for eliminating the more stringent options" in its BACT analysis.[211] It "is the responsibility of the permit reviewer to evaluate the documentation and rationale provided by the applicant."[212] As explained above, Port Arthur LNG failed to provide any such rationale.[213] And the TCEQ failed

---

[208] TCEQ's Agency Philosophy, available at https://www.tceq.texas.gov/agency/mission.html.
[209] ROA.7247; ROA.7249.
[210] ROA.7250.
[211] ROA.7250.
[212] ROA.7250.
[213] ROA.6072; ROA.6074.

to follow its own BACT policy in issuing a permit to Port Arthur LNG with less stringent pollution limits and no justifying rationale for those limits.[214]

## 2. EPA similarly requires TCEQ to consider BACT limits in recently issued/approved permits as achievable in the absence of a compelling showing otherwise.

As previously stated, a permit requiring a particular pollution limit is sufficient justification to assume the achievability and technical feasibility of that limit.[215] Here, TCEQ issued a permit to Rio Grande LNG with a $NO_x$ limit of 5 ppm and a CO limit of 15 ppm for its turbines.[216] Consequently, those limits are assumed to be achievable and technically feasible.

In addition to that standard assumption, EPA also provides a two-step test for analyzing technical feasibility. While EPA policy contemplates that analysis of a control technology which is "installed and operated successfully on the source under review" can be "straightforward".[217] It is only step one of the analysis. "For control technologies that are not demonstrated in the sense indicated above, the analysis is somewhat more involved."[218] In such cases, the achievability analysis proceeds to step two and asks whether the emission limits (and associated control technology) are "available" and "applicable."[219]

---

[214] ROA.7250.
[215] ROA.10739.
[216] ROA.12880.
[217] ROA.10749.
[218] ROA.10749.
[219] ROA.10749-53.

Regarding availability, EPA states that "[t]echnology is available if it can be obtained by the Applicant through commercial channels or is otherwise available within the common sense meaning of the term."[220] Here, the 2020 Rio Grande LNG application includes a vendor guarantee in the form of a "Baker Hughes Gas Turbine Data Sheet" which shows the GE Frame 7EA turbine capable of meeting a $NO_x$ emission rate "less than 5 ppm" using only Dry Low $NO_x$.[221] This vendor guarantee is evidence that Baker Hughes is in fact offering that model of turbine for sale to Rio Grande LNG. And Rio Grande LNG relied on this vendor guarantee to receive approval of its air quality permit from TCEQ.[222] It is further evidence that the GE Frame 7EA turbine with a $NO_x$ limit of 5 ppm and CO limit of 15 ppm (1) can be obtained through commercial channels, and (2) is available in the common sense meaning of the term.[223] The technology is thus "available."

And regarding applicability, EPA states that technology is "applicable" "if it can be reasonably installed and operated on the source type under consideration."[224] Applicability requires a "technical judgment," [225] but should not be understood to require operational data. "In general, a commercially available control option will be presumed applicable if it has been or *is soon to be deployed (e.g. is specified in a*

---

[220] ROA.10749.
[221] ROA.13524-26.
[222] ROA.13524-26.
[223] ROA.13524-26.
[224] ROA.10749.
[225] ROA.10750.

*permit)* on the same or a similar source type."[226] Here, evidence in the record shows that the GE Frame 7EA turbine capable of meeting limits of 5 ppm $NO_x$ and 15 ppm CO is commercially available and has been specified in an approved and valid permit for Rio Grande LNG operating the same model of turbine in the same refrigeration compression service proposed for Port Arthur LNG.[227] These limits are thus presumed applicable to Port Arthur LNG.

Because the lower limits of 5 ppm $NO_x$ and 15 ppm CO are "available" and "applicable" as EPA defines those terms, they must be considered "achievable" within the meaning of the Federal definition of BACT, and thus must be analyzed in the BACT analysis for Port Arthur LNG.

In order to properly dismiss these lower limits as not achievable or technically infeasible, Port Arthur LNG would be required to "make a factual demonstration of infeasibility based on commercial unavailability and/or unusual circumstances which exist with application of the control to the applicant's emission units."[228] Such a demonstration would involve "an evaluation of the pollutant-bearing gas stream characteristics and the capabilities of the technology,"[229] or "a showing of

---

[226] ROA.10750. (emphasis added).
[227] ROA.12880; ROA.11801; ROA.13517-18.
[228] ROA.10751.
[229] ROA.10751.

unresolvable technical difficulty with applying the control."[230] But Port Arthur LNG made no such showing.[231]

In the absence of that showing, the Commission's dismissal of the lower limits in the Rio Grande LNG permit on the grounds that they are not "achievable" was contrary to law and contrary to long-standing EPA policy.

### 3.    *TCEQ mischaracterized EPA policy and ignored EPA's specific guidance on this Permit.*

In making this erroneous decision, the Commission followed the arguments made by its staff in the Executive Director's Exceptions to the Proposal for Decision.[232] Staff arguments misstated the standards clearly articulated in the NSR Manual, and these misstatements prompted a response from EPA itself.[233] Following the filing of the Exceptions,[234] EPA sent a letter to TCEQ regarding concerns it had with TCEQ staff's mischaracterization of portions of EPA's NSR Manual.[235] EPA wrote:[236]

> With respect to limit achievability, it appears that the ED's argument raised in the exception filing centers around the suggestion that a control technology (and associated limit) cannot and does not establish BACT until such a technology and limit has been actually constructed, operated, and demonstrated in practice. Until such a

---

[230] ROA.10751.
[231] ROA.6072; ROA.6074.
[232] ROA.6175-79.
[233] ROA.24530-34.
[234] ROA.6170-86.
[235] ROA.24530-34.
[236] ROA.24533-34.

time, the ED argues that the limit is considered undemonstrated and "beyond BACT." With respect to the top-down BACT approach that was utilized for the refrigeration and compression turbines, the passages that the ED cites from the NSR Workshop Manual in its June 9, 2022, exception filing do not support the ED's suggestion that a BACT limitation must be operational to be considered technically feasible and achievable, and mischaracterizes EPA's recommendation for evaluating technical feasibility of a control technology and/or alternative as expressed in the NSR Workshop Manual.

EPA explicitly stated that TCEQ was mischaracterizing EPA guidance and policy with respect to Port Arthur LNG's permit.[237] EPA went on to outline the two-step test for achievability and technical feasibility, the framework discussed above, that the Commission ignored in issuing its Final Order.[238]

If the permitting authority concludes that a technology has not been demonstrated in practice, the second step recommended by EPA is to evaluate whether the technology is both "available" and "applicable" to the type of source for which the permit is sought. In this context, "available" means a technology that can be obtained through commercial channels (i.e., is commercially-available). EPA uses "applicable" in this context to mean there are no physical or chemical characteristics of the emissions stream that prevent the application of the technology and that can reasonably be deployed on the source type under consideration. With regard to the latter, "[i]n general, a commercially available control option will be presumed applicable if it has been or is soon to be deployed (e.g., is specified in a permit) on the same or a similar source type." *See NSR Workshop Manual* at B.18 (emphasis added). [ROA.10750] In other words, a control technology that has not been demonstrated in practice can still be considered technically feasible if it is both "available" and "applicable." Additionally, the NSR Workshop Manual states that "[a] permit requiring the application of a certain

---

[237] ROA.24533-34.
[238] ROA.24534.

technology <u>or emission limit</u> to be achieved for such technology usually is sufficient justification to assume the technical feasibility of that technology <u>or emission limit</u>." *See NSR Workshop Manual* at B.7 (emphasis added) [ROA.10739].

EPA explained that an emission limit specified in an approved permit is usually sufficient justification to assume that the limit is technically feasible—before concluding:[239]

> EPA thus disagrees with the ED's reliance on the EPA's NSR Workshop Manual to support the ED's argument regarding what unit-specific BACT limits are generally considered achievable under a PSD top-down analysis. EPA has long recognized that a control technology and associated limit is not always required to be operational or actually demonstrated in practice to be considered technically feasible and BACT, as suggested by the ED. In the absence of clear supporting documentation showing why a control technology is technically infeasible or a limit based on that technology is otherwise unachievable for a particular source taking into consideration energy, environmental, or economic impacts, a permitted BACT limit at a similar source (especially one that is supported by a vendor guarantee), can still be considered "achievable" consistent with 40 CFR 52.21(b)(12), even if a facility subject to such a limit is not yet operational.

EPA expressly stated to TCEQ regarding this permit that a permitted BACT limit does not need to be operational or have produced operational data to be considered achievable.[240] Further, EPA stated that "clear supporting documentation" must be provided to show an emission limit is not achievable, even if it is not yet

---

[239] ROA.24534.
[240] ROA.24534.

"operational or actually demonstrated in practice."[241] Neither Port Arthur LNG nor TCEQ introduced evidence that the Rio Grande LNG limits of 5 ppm $NO_x$ and 15 ppm CO were not achievable at Port Arthur LNG, which was their burden.[242, 243]

Not only did the Commission misapply Federal BACT and mischaracterize Federal guidance in issuing Port Arthur LNG's deficient permit, but the Commission also ignored EPA's explicit guidance and comments on this specific deficiency.

## CONCLUSION

The Texas Commission on Environmental Quality must comply with the Federal Clean Air Act in issuing major source air permits, including adhering to the Federal definition of BACT. In both EPA and TCEQ policy and established practice, the consideration of pollution emission limits in recently issued permits is the essential starting point for determining Federal BACT. In the absence of a showing by Port Arthur LNG that it cannot achieve the most stringent recently permitted limits, those limits must be BACT. The Commission departed from that policy and practice by wrongly dismissing the significantly more stringent pollution limits in the Rio Grande LNG permit. The result is a permit for Port Arthur LNG's turbines that will emit 80% more $NO_x$ and 66% more CO pollution than the same turbines at

---

[241] ROA.24534.

[242] ROA.6041; ROA.37506.

[243] Conclusion of Law No. 13 states that "The burden of proof on the issues referred to SOAH [State Office of Administrative Hearings] is on the Applicant by a preponderance of the evidence. 30 Tex. Admin. Code § 80.17(a)."

Rio Grande LNG. The Commission's action was contrary to law, contrary to long-standing TCEQ and EPA policy and practice, contrary to the ALJs' findings after a lengthy hearing, and contrary to the undisputed facts in the record.

Petitioner-Appellant Port Arthur Community Action Network respectfully requests that the Court find that TCEQ failed to follow applicable law in issuing a new air permit for the Port Arthur LNG liquefied natural gas export terminal and that its Final Order issuing the air permit is invalid, arbitrary, or unreasonable given the record before the agency.

Submitted by:

*/s/ Colin Cox*
Colin Cox
Texas Bar No. 24101653
Environmental Integrity Project
1206 San Antonio Street
Austin, TX 78701
832-316-0580
colincox@environmentalintegrity.org

Amy Catherine Dinn
Texas Bar No. 24026801
Natasha Bahri
Texas Bar No. 24101476
Chase Porter
Texas Bar No. 24102368
Lone Star Legal Aid
1415 Fannin Street
Houston, TX 77002
713-652-0077 ext 8108
adinn@lonestarlegal.org
nbahri@lonestarlegal.org
cporter@lonestarlegal.org

COUNSEL FOR APPELLANT
PORT ARTHUR COMMUNITY ACTION
NETWORK

# CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of February, 2023, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system to the following counsel of record:

*Attorneys for Respondents*

Mr. Mark Andrew Steinbach
Erin Kathleen Snody
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
mark.steinbach@oag.texas.gov
erin.snody@oag.texas.gov

*Attorneys for Intervenors*

Aaron M. Streett
Baker Botts LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
aaron.streett@bakerbotts.com

Derek McDonald
Baker Botts LLP
98 San Jacinto Blvd, Ste 1500
Austin, Texas 78701-4082
derek.mcdonald@bakerbotts.com

*/s/ Amy Catherine Dinn*
Counsel for Appellant
Port Arthur Community Action Network

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 11,569 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2301 Build 16.0.16026.20002) in Times New Roman 14 point font.

*/s/ Amy Catherine Dinn*
Counsel for Appellant
Port Arthur Community Action Network
