No. 22-60556

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

PORT ARTHUR COMMUNITY ACTION NETWORK,

*Petitioner,*

*v.*

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; and
JON NIERMANN, in his official capacity as CHAIRPERSON OF THE TEXAS
COMMISSION ON ENVIRONMENTAL QUALITY,

*Respondents,*

PORT ARTHUR LNG, LLC,

*Intervenor–Respondent.*

On Petition for Review from the
Texas Commission on Environmental Quality
No. 2021-0942-AIR

**INTERVENOR–RESPONDENT
PORT ARTHUR LNG'S RESPONSE BRIEF**

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
Tel.: (713) 229-1855

Derek R. McDonald
BAKER BOTTS L.L.P.
401 South 1st Street, Suite 1300
Austin, TX 78704
Tel.: (512) 322-2667

*Counsel for Intervenor–Respondent
Port Arthur LNG, LLC*

---

No. 22-60556

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

PORT ARTHUR COMMUNITY ACTION NETWORK,

*Petitioner*,

*v.*

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; and
JON NIERMANN, in his official capacity as CHAIRPERSON OF THE TEXAS
COMMISSION ON ENVIRONMENTAL QUALITY,

*Respondents*,

PORT ARTHUR LNG, LLC,

*Intervenor–Respondent.*

---

On Petition for Review from the
Texas Commission on Environmental Quality
No. 2021-0942-AIR

---

## CERTIFICATE OF INTERESTED PERSONS

---

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Ahmed, J. Amber, Assistant Attorney General, Environmental Protection Division, Office of the Attorney General of Texas (Counsel for Respondents)

i

- Bahri, Natasha (Counsel for Petitioner)

- Baker Botts L.L.P. (Counsel for Intervenor–Respondent)

- Beard, John (Individual Member of Petitioner)

- Carter, Beau (Counsel for Intervenor–Respondent)

- Cox, Colin (Counsel for Petitioner)

- Dinn, Amy Catherine (Counsel for Petitioner)

- Environmental Integrity Project (Counsel for Petitioner)

- Lone Star Legal Aid (Counsel for Petitioner)

- McDonald, Derek R. (Counsel for Intervenor–Respondent)

- Niermann, Jon, Chairperson, Texas Commission on Environmental Quality (Respondent)

- Office of the Attorney General of Texas (Counsel for Respondents)

- Porter, Chase (Counsel for Petitioner)

- Port Arthur Community Action Network (Petitioner)

- Port Arthur LNG, LLC (Intervenor–Respondent); Black Silverback ZC 2022 LP; ConocoPhillips Port Arthur LNG LLC; KKR Pinnacle Investor L.P.; PALNG Operator Company, LLC; Port Arthur Liquefaction Holdings, LLC; Sempra Global Holdings, LP; Sempra Infrastructure Partners, LP; Sempra LNG Holding, LP; Sempra PALNG Holdings, LLC (Related Corporate Entities)

- Snody, Erin K., Assistant Attorney General, Environmental Protection Division, Office of the Attorney General of Texas (Counsel for Respondents)

- Streett, Aaron M. (Counsel for Intervenor–Respondent)

- Texas Commission on Environmental Quality (Respondent)

Dated: March 31, 2023                    Respectfully submitted,


                                         */s/ Aaron M. Streett*
                                         Aaron M. Streett

                                         *Counsel for Intervenor–Respondent*
                                         *Port Arthur LNG, LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Under Fifth Circuit Rule 28.2.3 and Federal Rule of Appellate Procedure 34(a)(1), Port Arthur LNG submits that the Court would benefit from oral argument in this case, as it implicates the complex interplay between the federal Clean Air Act, Texas's EPA-approved state implementation plan, and the Texas Commission on Environmental Quality's administration of air-quality permitting under both.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ........................................................ iv

Table of Authorities ................................................................................ vii

Issue Presented ......................................................................................... 1

Introduction ............................................................................................... 2

Statement of the Case ............................................................................... 3

    I.     Legal Framework ......................................................................... 3

          A.    The Clean Air Act ............................................................... 3

          B.    Texas's PSD Program ......................................................... 7

    II.    Factual Background ................................................................... 11

          A.    Port Arthur LNG's Initial Permit .................................... 11

          B.    Port Arthur LNG's Expansion ......................................... 11

    III.   Procedural Background ............................................................. 13

Summary of Argument ........................................................................... 17

Standard of Review ................................................................................ 18

Argument ................................................................................................ 20

    I.     PACAN lacks standing to challenge the permit's CO emission limits because it does not allege any injury flowing from CO emissions. ................................................................................. 21

    II.    The Act gives the Commission discretion to consider BACT on a case-by-case basis under Texas's PSD SIP. .................................... 24

    III.   The Commission's approval of Port Arthur LNG's permit was supported by substantial evidence. ................................................ 27

          A.    The record contains substantial evidence that Port Arthur LNG's proposed emission limits were BACT. ......................... 27

          B.    The existence of another permit with lower emission limits, without evidence establishing BACT in practice, does not rebut Port Arthur LNG's substantial evidence and statutory presumption of validity. ............................................. 34

Conclusion ...................................................................................42

Certificate of Compliance ...........................................................44

Certificate of Service ..................................................................44

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Alaska Dep't of Envtl. Conservation v. EPA,*
　540 U.S. 461 (2004) ................................................................6, 9, 26, 35

*Atl. Richfield Co. v. Christian,*
　140 S. Ct. 1335 (2020) ...........................................................................3

*BCCA Appeal Grp. v. EPA,*
　355 F.3d 817 (5th Cir. 2003) ..............................................................4, 5

*Brazoria County v. EEOC,*
　391 F.3d 685 (5th Cir. 2004) ................................................................23

*CleanCOALition v. TXU Power,*
　536 F.3d 469 (5th Cir. 2008) ..................................................7, 8, 24, 26

*Ctr. for Biological Diversity v. EPA,*
　937 F.3d 533 (5th Cir. 2019) ................................................21, 22, 23

*Environment Texas Citizen Lobby, Inc. v. ExxonMobil Corp.,*
　47 F.4th 408 (5th Cir. 2022) .................................................................22

*Exelon Wind 1, L.L.C. v. Nelson,*
　766 F.3d 380 (5th Cir. 2014) ...........................................................20, 36

*Fla. Power & Light Co. v. Costle,*
　650 F.2d 579 (5th Cir. 1981) .............................................................5, 20

*Gill v. Whitford,*
　138 S. Ct. 1916 (2018) ..........................................................................22

*GM Corp. v. United States,*
　496 U.S. 530 (1990) ................................................................................4

*Huron Portland Cement Co. v. City of Detroit,*
　362 U.S. 440 (1960) ................................................................................3

*Hydro Invs. v. FERC,*
　351 F.3d 1192 (D.C. Cir. 2003) ...........................................................23

vii

*Jenkins v. Crosby Indep. Sch. Dist.*,
    537 S.W.3d 142 (Tex. App.—Austin 2017, no pet.) ....................................19, 28

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...........................................................................................21

*Luminant Generation Co. v. EPA*,
    675 F.3d 917 (5th Cir. 2012) .............................................................................4, 5

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) .............................................................................4

*Mireles v. Tex. Dep't of Pub. Safety*,
    9 S.W.3d 128 (Tex. 1999) ....................................................................................19

*Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*,
    647 F.3d 202 (5th Cir. 2011) ...............................................................................22

*Pennzoil Co. v. FERC*,
    645 F.2d 360 (5th Cir. 1981) ...............................................................................23

*Power Res. Grp. v. Pub. Util. Comm'n of Tex.*,
    422 F.3d 231 (5th Cir. 2005) ...............................................................................20

*Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*,
    153 S.W.3d 174 (Tex. App.—Austin 2004, pet. denied) ....................................39

*Sierra Club v. Korleski*,
    681 F.3d 342 (6th Cir. 2012) .................................................................................7

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ...............................................................................21

*Tex. Comm'n on Envtl. Quality v. Exxon Mobil Corp.*,
    504 S.W.3d 532 (Tex. App.—Austin 2016, no pet.) ...........................................19

*Tex. Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ...............................................................................21

*Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*,
    324 S.W.3d 95 (Tex. 2010) ............................................................................19, 28

*Texas v. Pub. Util. Comm'n of Tex.*,
    883 S.W.2d 190 (Tex. 1994) .........................................................19, 36

*TJFA, L.P. v. Tex. Comm'n on Envtl. Quality*,
    632 S.W.3d 660 (Tex. App.—Austin 2021, pet. filed) ...............18–19

*Twp. of Bordentown v. FERC*,
    903 F.3d 234 (3d Cir. 2018) ...............................................................18

*Train v. Nat. Res. Def. Council, Inc.*,
    421 U.S. 60 (1975)............................................................................4, 5

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021).........................................................................22

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976).............................................................................5

*United States v. Luminant Generation Co., L.L.C.*,
    905 F.3d 874 (5th Cir. 2018), *pet. for rehearing granted*, 929 F.3d
    316 (5th Cir. 2019), *dismissed*, 2019 WL 3778363 (5th Cir.)............6

*Wimberley Springs Partners, Ltd. v. Wimberley Valley Watershed
    Ass'n*,
    No. 03-13-00467-CV, 2017 WL 2229876 (Tex. App.—Austin
    May 19, 2017, no pet.) (mem. op.) ....................................................19

**STATUTES**

15 U.S.C. § 717r(d)(1) .................................................................................11

42 U.S.C. § 7407(d)(1)(A)(ii) .......................................................................5

42 U.S.C. §§ 7408–09 ..................................................................................4

42 U.S.C. § 7410(a)(1) ..................................................................................5

42 U.S.C. § 7413(a)(2)...................................................................................7

42 U.S.C. § 7413(b)(1)...............................................................................6, 34

42 U.S.C. §§ 7470–7479 ..............................................................................5

42 U.S.C. § 7475............................................................................................24

42 U.S.C. § 7475(a) ...................................................................6

42 U.S.C. § 7475(c) ...................................................................6

42 U.S.C. § 7479(1) ...................................................................6

42 U.S.C. § 7479(3) ..........................................................8, 24, 35

42 U.S.C. § 7509(a)(4) ...............................................................7

42 U.S.C. § 7509(b)(1)–(2) .........................................................7

Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 .......................4

Tex. Gov't Code § 2001.174 .......................................................19

Tex. Gov't Code § 2003.047(i-1)–(i-2) ................................10, 12, 27, 32

Tex. Gov't Code § 2003.047(m) ...............................................39, 40

Tex. Health & Safety Code § 382.001 .........................................8

Tex. Health & Safety Code § 382.032 .......................................18

Tex. Health & Safety Code § 382.0518(a) ..................................8

Tex. Health & Safety Code § 382.0518(b) ..................................9

Tex. Health & Safety Code § 382.0518(b)(1) .........................9, 26

## OTHER AUTHORITIES

30 Tex. Admin. Code § 80.272(e)(1) .........................................16

30 Tex. Admin. Code § 116.10(1) .......................................9, 16, 36

30 Tex. Admin. Code § 116.111 ................................................10

30 Tex. Admin. Code § 116.111(a)(2)(C) ..................................26

30 Tex. Admin. Code §§ 116.160–63 ........................................10

30 Tex. Admin. Code § 116.160(c)(1)(A) .............................8, 24, 26, 35

40 C.F.R. § 52.21(b)(12) .......................................................8, 24

40 C.F.R. § 52.2270 ...............................................................................6

40 C.F.R. § 52.2270(c)–(d) ...................................................................5

54 Fed. Reg. 52,823 (Dec, 22, 1989) ...................................................25

57 Fed. Reg. 28,093 (June 24, 1992) ...............................6, 7, 25, 26, 35

67 Fed. Reg. 58,697 (Sept. 18, 2002) ...................................................7

*Rio Grande LNG Approval*, Natural Gas Intelligence (Feb. 7, 2023),
    https://www.naturalgasintel.com/nextdecade-urges-ferc-to-act-on-
    rio-grande-lng-approval/ ...............................................................41

*Sempra Launches Port Arthur LNG Project* (Mar. 20, 2023),
    https://www.sempra.com/sempra-launches-port-arthur-lng-project .................41

**ISSUE PRESENTED**

Did the Commission act arbitrarily and capriciously by approving Port Arthur

LNG's PSD Permit?

# INTRODUCTION

Port Arthur LNG plans to build a liquefied natural gas export terminal in Texas. To do so, it applied for an air quality permit with the Texas Commission on Environmental Quality, providing all the necessary evidence and documentation in support. Part of the project includes the construction and use of eight gas-fired refrigeration compression turbines, which liquefy and compress the natural gas. The Commission determined, under state and federal law, that Port Arthur LNG proposed to use the "best available control technology" (BACT) for limiting the emission of nitrogen oxides and carbon monoxide from its turbines. The Commission concluded that the emission limits proposed were BACT after examining extensive evidence in Port Arthur LNG's application and the emission limits achieved at comparable facilities. The Court must uphold the Commission's BACT determination if it is supported by substantial evidence.

Port Arthur Community Action Network (PACAN) disagrees *not* with the *technology* that Port Arthur LNG plans to use to control emissions from its turbines. Rather, it contends that a recent permit (that is not in the record) for another project (that has not been constructed) has lower emission limits, which PACAN says overrides the substantial evidence *in the record* demonstrating *in practice* that Port Arthur LNG's emission limits are BACT. To reach that conclusion, PACAN misapprehends the Clean Air Act, Texas's state implementation plan, and guidance

2

from the Commission and EPA. Not only is PACAN's approach wrong on the law—an untested permit does not automatically establish BACT for a pending project—it also makes no sense in practice. Private companies (like Port Arthur LNG) would face costly enforcement actions if they were unable to meet emission limits that have not been demonstrated as achievable for the life of the project. That is a risk that most investors would be unwilling to take when considering whether to support expensive infrastructure projects. The Court should deny PACAN's petition.

## STATEMENT OF THE CASE

## I.      Legal Framework

This case involves a Prevention of Significant Deterioration (PSD) permit issued by the Texas Commission on Environmental Quality (the Commission or TCEQ) to Port Arthur LNG. The program through which the Commission issued the PSD permit was set up in collaboration with the federal Environmental Protection Agency. Understanding the state–federal partnership and the issues in this case require a recounting of the program's history.

### A.      The Clean Air Act

The power to regulate and protect America's environment has "traditional[ly]" been a "central responsibility of state governments," *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1362 (2020) (Gorsuch, J., concurring in part and dissenting in part), reflecting an exercise of the states' "police power," *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960). Congress entered the environmental arena

3

in the 1960s with statutes, like the Clean Air Act of 1963, designed to encourage states' proactivity in limiting their impact on the environment. *See Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 63–64 (1975). Those programs culminated in Congress passing and President Nixon signing the Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676, which make up much of what the Clean Air Act is today, 42 U.S.C. § 7401, *et seq.*

The Act is an "experiment in cooperative federalism" which establishes "a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001); *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003)); *see GM Corp. v. United States*, 496 U.S. 530, 532 (1990) (the Act "made the States and the Federal Government partners in the struggle against air pollution"). Through this partnership, the Act requires EPA to identify air pollutants and to set standards for addressing those pollutants (called national ambient air quality standards, or NAAQS). 42 U.S.C. §§ 7408–09.

Once EPA sets those numerical benchmarks through the ordinary rulemaking process, the states have "primary responsibility" for implementing the standards. *Id.* § 7407(a); *Michigan*, 268 F.3d at 1083 (EPA's "overarching role is in setting standards, not in implementation"). A state does so by adopting and administering

4

a "state implementation plan" (SIP), which details how the state plans to achieve the national standards. 42 U.S.C. § 7410(a)(1). In crafting a SIP, a state has free rein to meet the national standards however it sees fit, so long as its SIP complies with statutory mandates. *Train*, 421 U.S. at 79 ("[T]he State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation."); *see Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976) ("Each State is given wide discretion in formulating its plan[.]"). EPA's role in the process is "ministerial": if the SIP complies with the Act, EPA must approve it. *Luminant*, 675 F.3d at 921; *see Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under" the Act is "illustrated by the sharply contrasting, narrow role to be played by EPA.").[1]

At issue here is Texas's SIP addressing its Prevention of Significant Deterioration (PSD) permitting program. 42 U.S.C. §§ 7470–7479. Relevant here, PSD programs apply in "attainment" areas—that is, areas that *meet* national standards for a given pollutant, *id.* § 7407(d)(1)(A)(ii), such as nitrogen oxides ($NO_x$) or carbon monoxide (CO). The purpose of these PSD programs is to make

---

[1] A state's omnibus SIP can be found in 40 C.F.R. ch. 52. In practice, EPA sets different standards for different pollutants and states in turn propose separate SIPs to comply with those and various other requirements of the Act. *E.g.*, 40 C.F.R. § 52.2270(c)–(d) (compiling Texas's various approved SIP proposals). Each individual approved SIP proposal is referred to by its specific content, such as a "[new-source review] SIP," *Luminant*, 675 F.3d at 921, or an "attainment demonstration SIP," *BCCA*, 355 F.3d at 823.

sure that those satisfactory areas remain satisfactory. *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 470–71 (2004).

Before constructing a "major emitting facility" in an "attainment" area, a company (like Port Arthur LNG) must obtain a PSD permit. 42 U.S.C. § 7475(a); *see id.* § 7479(1) (defining "major emitting facility"). To get a permit, the applicant must establish (among other things) that its facility will use the "best available control technology" for limiting the emission of regulated pollutants. *Id.* § 7475(c). As with other aspects of the Act, "states have the primary role in administering and enforcing the various components of the PSD program." *Alaska*, 540 U.S. at 491 (quoting 57 Fed. Reg. 28,093, 28,095 (June 24, 1992), Texas's PSD SIP).

Once EPA approves the SIP, the state then operates the PSD permitting program. 40 C.F.R. § 52.2270. EPA assumes a role limited to oversight and, if necessary, enforcement. To ensure continued compliance with the Act, EPA may pursue a civil action against permit-holders if EPA believes that a permitted facility fails to maintain the standards set out in its permit. 42 U.S.C. § 7413(b)(1). The penalties for non-compliance are stark: not only can EPA seek temporary or permanent injunctive relief; it can concurrently seek a civil penalty of up to $25,000 *per day* for each violation. *Id.*; *see United States v. Luminant Generation Co., L.L.C.*, 905 F.3d 874, 883 & n.13 (5th Cir. 2018), *pet. for rehearing granted*, 929 F.3d 316 (5th Cir. 2019), *dismissed*, 2019 WL 3778363 (5th Cir.). The Act also

6

authorizes citizen suits to enforce compliance with standards set out in permits. *CleanCOALition v. TXU Power*, 536 F.3d 469, 471–73 (5th Cir. 2008). And if EPA believes that a state is not properly administering a SIP provision, EPA can enforce the provision itself, and it can impose sanctions on the state "which may include withdrawal of the State's federal highway funds." *Sierra Club v. Korleski*, 681 F.3d 342, 343–44 (6th Cir. 2012) (citing 42 U.S.C. §§ 7413(a)(2), 7509(a)(4), (b)(1)–(2)).

### B.    Texas's PSD Program

Texas proposed a PSD SIP and EPA approved it, finding that it complied with the Clean Air Act in all respects. *See* Approval and Promulgation of Implementation Plan State of Texas Prevention of Significant Deterioration, 57 Fed. Reg. 28,093 (June 24, 1992); Approval and Promulgation of Implementation Plans; Texas; Revisions to Regulations for Control of Air Pollution by Permits for New Sources and Modifications, 67 Fed. Reg. 58,697 (Sept. 18, 2002) (amending the previous PSD SIP). The Commission therefore administers Texas's PSD permitting program under the applicable Texas law. *See CleanCOALition*, 536 F.3d at 472–73. Under this program, "[b]efore work is begun on the construction of a new facility or a modification of an existing facility that may emit air contaminants, the person

planning the construction or modification must obtain a permit or permit amendment from the [C]ommission." Tex. Health & Safety Code § 382.0518(a).[2]

The Commission's regulations define the permitting requirements consistent with the Clean Air Act. *See CleanCOALition*, 536 F.3d at 472–73 (describing the Act's requirements and Texas's coextensive laws and regulations). Pertinent here, the Commission defines the BACT requirement the same as the federal Act:

> The term "best available control technology" means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant.

42 U.S.C. § 7479(3); *see* 30 Tex. Admin. Code § 116.160(c)(1)(A) (incorporating the substantively identical definition in 40 C.F.R. § 52.21(b)(12)). The Commission further defines BACT as an "air pollution control method" "that through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility, and is considered technically practical and

---

[2] Chapter 382 of the Texas Health & Safety Code is referred to as the Texas Clean Air Act (TCAA), Tex. Health & Safety Code § 382.001, which establishes the processes through which the Commission complies with Texas's PSD SIP.

economically reasonable for the facility." 30 Tex. Admin. Code § 116.10(1). The Commission thus reviews "the information available" to it and grants permits that "will use at least the best available control technology considering the technical practicability and economic reasonableness of reducing or eliminating the emissions resulting from the facility." Tex. Health & Safety Code § 382.0518(b)(1).

Both the Commission and EPA have their own methods for determining what constitutes BACT for any given permit on a case-by-case basis. *See Alaska*, 540 U.S. at 476 n.7 (noting that the Act does not require a specific method). The Commission employs a "three-tiered method," while EPA uses a "top-down method," but both are expected to reach the same result.[3] ROA.6360. The hallmarks of both are (1) technical feasibility and (2) economic reasonableness. ROA.7241, 7250–51; *see* Tex. Health & Safety Code § 382.0518(b).

With respect to technical feasibility, the Commission and EPA have each issued guidance for preparing a permit application that specifies how to identify BACT.

---

[3] The Commission's three-tiered method can be briefly summed up as follows: Tier I involves a comparison of the applicant's BACT proposal and "the emission reduction performance levels accepted as BACT in recent [new-source review] permit reviews for the same process and/or industry." If there are no comparable determinations for the same process and/or industry and BACT has not been established in Tier I, Tier II "involves a comparison of the applicant's BACT proposal to the emission reduction performance levels that have been accepted as BACT in recent permit review for similar air emission streams in a different process or industry type." And if BACT is not established at either Tier I or Tier II, Tier III involves identifying control techniques, eliminating technically infeasible options, ranking the remaining technologies by control effectiveness, evaluating the most effective results, and then choosing the most effective control not already rejected. ROA.7242.

Under the Commission's guidance, for a technology to qualify as BACT, "the emission reduction option(s) should have been successfully demonstrated in Texas and the United States." ROA.7247. EPA's guidance is consistent with the Commission's, indicating that "[t]echnologies which have not yet been applied to (or permitted for) full scale operations need not be considered available; an applicant should be able to purchase or construct a process or control device that has already been *demonstrated in practice.*" ROA.10743 (emphasis added); *see* ROA.10744 ("To satisfy the legislative requirements of BACT, EPA believes that the applicant must focus on technologies with a demonstrated potential to achieve the highest levels of control.").

The permitting program begins with the application. *See* 30 Tex. Admin. Code §§ 116.111, 116.160–63. Texas law requires notice and comment on the permit application. *Id.* § 55.150, *et seq.* If the Commission's executive director preliminarily approves the application and draft permit, the permit is presumed to satisfy state and federal law and the burden shifts to the "affected person" to rebut the statutory presumption. Tex. Gov't Code § 2003.047(i-1)–(i-2). Any party granted "affected person" status may then challenge the permit application in a "contested" hearing before state administrative-law judges. 30 Tex. Admin. Code § 55.200, *et seq.*

10

If the Commission renders a final decision to issue the PSD permit, this Court has "original and exclusive jurisdiction" over any challenge to that decision. 15 U.S.C. § 717r(d)(1).

## II.     Factual Background

### A.     Port Arthur LNG's Initial Permit

Port Arthur LNG plans to build a natural gas liquefaction plant and export terminal in Jefferson County, Texas. ROA.6356. The project will include four liquefaction trains to produce liquefied natural gas (LNG). *Id.* Each liquefaction train can produce roughly 6.76 million metric tons per year of LNG under optimal conditions. *Id.* The gas will be stored in thermally insulated tanks and loaded onto ships for export at the project's berthing area. *Id.* The Commission approved a PSD permit for the first two liquefaction trains (Trains 1 and 2) and the accompanying facilities in February 2016. ROA.6709–56.

### B.     Port Arthur LNG's Expansion

A few years later, in September 2019, Port Arthur LNG applied for a PSD permit to build and operate two additional trains (Trains 3 and 4) following the same emission standards as the first two (which have not yet been constructed) and updated the previously permitted design to the current project design for all four trains. ROA.6356. The application analyzed both the Commission's and EPA's approaches to establish that its proposed facilities would meet BACT for every source of its emissions. ROA.14017. Port Arthur LNG then went through the

11

notice-and-comment process. ROA.6357. In June 2020, consistent with the initial approval for Trains 1 and 2, the Commission's executive director preliminarily approved the permit, ROA.411, which gave Port Arthur LNG the statutory presumption of validity under Texas law, Tex. Gov't Code § 2003.047(i-1)–(i-2).

Notable here, the draft permit authorized eight "gas-fired refrigeration compression turbines." ROA.6037, 6362. These turbines drive the refrigeration and liquefaction of the natural gas before it is ultimately exported as liquid natural gas. ROA.6036, 6616. During their operation, the turbines emit carbon monoxide (CO) and nitrogen oxides ($NO_x$). ROA.434–35. To control CO emissions, Port Arthur LNG proposed to use good combustion practices to limit those emissions to 25 ppm[4] at 15% oxygen over a three-hour rolling average period. ROA.14107. For $NO_x$ emissions, it proposed to use turbines manufactured with dry-low $NO_x$ technology to limit those emissions to 9 ppm at 15% oxygen over a 24-hour rolling average period. *Id.* The turbine manufacturer provided data indicating that the technology would limit pollutant emissions to these specified levels, which Port Arthur LNG included in its permit application. ROA.73, 81, 33116–17; *see* ROA.7185 ("[The manufacturer] guaranteed that the turbines can reliably meet a 9 ppmv $NO_x$

---

[4] The "ppm" unit is shorthand for "parts per million by volume, dry (ppmvd)." *See* PACAN Br. 10 n.10.

emissions limit."). The Commission's draft permit adopted these proposed emission limits as BACT, including 9 ppm for $NO_x$ and 25 ppm for CO. ROA.434–35.

Port Arthur Community Action Network (PACAN) submitted comments and requested a contested hearing. ROA.6356–57. The Commission referred the application for a contested hearing on PACAN's status as an "affected party" and the merits of PACAN's challenges to Port Arthur LNG's permit. ROA.6357–58.

## III.    Procedural Background

The permit challenge proceeded before Texas's State Office of Administrative Hearings. ROA.6358. After determining that PACAN was an "affected party," two administrative law judges considered the merits of PACAN's challenge. ROA.6358–59. While the Commission forwarded several questions to the ALJs, PACAN challenged only the draft permit's BACT determinations as to several of the project's emission sources. ROA.6043–44. PACAN's BACT challenges focused on particular technologies and the emission limits for Port Arthur LNG's (1) refrigeration compression turbines, (2) power generation turbines, (3) flares, (4) thermal oxidizers, and (5) fugitive emissions. ROA.6034–35, 6050–6105. PACAN's petition in this Court challenges only the emission limits on the refrigeration compression turbines.[5]

---

[5] PACAN originally argued that Port Arthur LNG should be required to use costly selective catalytic reduction ("SCR") technology on its refrigeration turbines, but Port Arthur LNG proved

Before the ALJs, PACAN pointed to the existence of another permit that had been issued with lower emission limits than those Port Arthur LNG proposed and the Commission included in the draft permit. Specifically, Rio Grande LNG was originally permitted at the same $NO_x$ and CO limits that Port Arthur LNG proposed, ROA.11808, 11811, but Rio Grande LNG later revised its BACT limits purportedly based on a supposed "guarantee" from its manufacturer that its turbines would emit $NO_x$ at only 5 ppm and CO at 15 ppm, ROA.12877, 12880. That revision occurred over two years *after* Port Arthur LNG's application and a month *after* the Commission's executive director preliminarily approved its draft permit. Indeed, PACAN informed Port Arthur LNG of this revision the night before the hearing, and the administrative record contains little of substance about Rio Grande LNG.[6] Though Rio Grande LNG apparently has a *permit* at those limits, nothing in the record explains *why* it lowered those limits, and it has yet to start building the project or even purchase the turbines. ROA.13024.

---

(and PACAN no longer challenges) that SCR technology is neither technically feasible nor economically reasonable for those turbines.

[6] *See, e.g.*, ROA.13524 (PACAN's counsel noting that he was not "offering" the Rio Grande LNG 2020 application "into evidence"). PACAN relies heavily on the alleged "vendor guarantee," but it was not in the record before the ALJs or the Commission. The ALJs allowed PACAN to introduce the amendment's "Source Analysis & Technical Review" sheet—which does not explain the reasoning for the revision—but would not allow Port Arthur LNG to introduce either the revised permit or the revised application. ROA.13107, 13523–24. The executive director's expert, Dr. Hansen, reviewed the revised application and, when shown parts of it, indicated that it included "a data sheet," "not a vendor guarantee." ROA.13525.

Both Port Arthur LNG and the Commission's executive director put on expert testimony explaining that, in the PSD permitting process, BACT is established in practice, not merely by what others have been approved to build.  Dr. Hansen, one of the Commission's most senior engineers in charge of reviewing permit applications, emphasized that "it *does* matter if it's been used in practice, and it's not enough that it's been proposed."  ROA.13548 (emphasis added).  He explained that while a database "lists BACT determinations or emissions levels that are reported in different applications, until those are actually implemented in practice and we see that we are actually getting that level of control, it wouldn't be reasonable, and I think common sense would dictate it wouldn't be fair to require people to meet those levels until it's actually been demonstrated that that's achievable."  ROA.13547; ROA.13517–18 (another expert testifying to the same effect).  PACAN's own witness could not identify any authority supporting the position that BACT emission limits may be derived from permits or permit applications for yet-to-be-constructed or even cancelled projects.  ROA.12975–76.

Nevertheless, the ALJs adopted PACAN's permitted-but-not-proven theory wholesale and proposed that the Commission approve Port Arthur LNG's permit with PACAN's preferred limits instead of the ones established by the evidence provided by Port Arthur LNG and the executive director.  ROA.6072.

15

On review of the ALJs' proposal for decision, the Commission rejected the ALJs' BACT analysis and issued the permit with Port Arthur LNG's proposed emission limits.  ROA.6362–63, 6372–73.  The Commission provided reasons for departing from the ALJs' reasoning.  It discounted the ALJs' conclusions on the turbines' BACT limits because even though a similar permit had recently been *issued*, those limits had not been *demonstrated* in practice; thus, PACAN could not rebut Port Arthur LNG's statutory presumption and the other substantial evidence in the record.    ROA.6372–73.    This determination was consistent with the Commission's regulatory guidance and its further elucidation of BACT's meaning.  *See* 30 Tex. Admin. Code § 116.10(1) (BACT is established "through experience and research" and must be "proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility"); ROA.7247.  The Commission therefore concluded that the "best available control technology" for Port Arthur LNG's turbines was a $NO_x$ limit of 9 ppm and a CO limit of 25 ppm. ROA.6363, 6371.

PACAN moved for rehearing, which was denied by operation of law.  ROA.24423–25047; 30 Tex. Admin. Code § 80.272(e)(1).  PACAN then filed a petition for review in this Court and Port Arthur LNG timely intervened.

16

### SUMMARY OF ARGUMENT

The Court should deny PACAN's petition for review.  At the outset, PACAN relies exclusively on its evidence establishing *administrative* standing to establish its Article III standing.  But that evidence fails to prove—and PACAN fails even to allege—*any* injury from the emission of CO.  Because PACAN must establish standing as to each alleged legal violation, PACAN does not have standing to challenge the Commission's BACT determination as to the CO emission limit.

On the merits, PACAN fundamentally misunderstands the Commission's role in administering the substantive provisions of the Clean Air Act.  In this role, the Commission must review PSD permit applications and determine whether they comply with Texas's PSD SIP, which has been approved by EPA as compliant with the Act.  The Commission is not bound by EPA guidance.  Here, the Commission carefully reviewed Port Arthur LNG's extensive, highly technical evidence, determined that its BACT proposal was consistent with other already operational projects, and thus properly granted the permit.  Under substantial-evidence review, there was a reasonable basis for this decision, so the Court should not accept PACAN's invitation to second-guess the Commission's judgment.

PACAN's preferred approach is at odds with state and federal law, administrative guidance, and common sense.  PACAN insists that BACT is automatically established as soon as emission limits are *permitted* at another facility,

17

regardless whether any evidence has *proven* those limits to be achievable in practice. But this type of inflexible rule does not accord with the fact-intensive, case-by-case nature of BACT determinations. State and federal law both confirm that the Commission should review permits on a case-by-case basis, and that *evidence* of "achievable" emission limits outweighs the mere *expectation* of those limits. The Commission, charged with implementing the PSD program, has issued guidance making clear that emission limits must be proven operational in practice before they become BACT, and that permitted emission limits go from "beyond BACT" to "BACT" once they are so established. Given the stark consequences of noncompliance with these emission limits, and the need to comply with these limits for the life of the facility, common sense favors an approach that prioritizes evidence over conjecture.

### STANDARD OF REVIEW

Courts reviewing state agency action give the agencies the same deference they receive under state law. PACAN Br. 18; *Twp. of Bordentown v. FERC*, 903 F.3d 234, 270 (3d Cir. 2018). Consequently, this Court may disturb the Commission's actions only if they are "invalid, arbitrary, or unreasonable." Tex. Health & Safety Code § 382.032. That standard incorporates "the entire scope of review allowed by the 'substantial evidence' standard codified in the [Texas] Administrative Procedure Act." *TJFA, L.P. v. Tex. Comm'n on Envtl. Quality*, 632 S.W.3d 660, 666 (Tex.

App.—Austin 2021, pet. filed) (quoting *Tex. Comm'n on Envtl. Quality v. Exxon Mobil Corp.*, 504 S.W.3d 532, 535 n.1 (Tex. App.—Austin 2016, no pet.)).

Under the substantial-evidence standard, a court may not "substitute its judgment" for that of the agency. Tex. Gov't Code § 2001.174. Review is not for "whether the agency's decision was correct, but only whether the record demonstrates some reasonable basis for the agency's action. Courts must affirm administrative findings in contested cases if there is more than a scintilla of evidence to support them." *Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*, 324 S.W.3d 95, 105 n.60 (Tex. 2010) (quoting *Mireles v. Tex. Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999)). This substantial-evidence review is "[e]ssentially" a "rational-basis test to determine, as a matter of law, whether an agency's order finds reasonable support in the record." *Jenkins v. Crosby Indep. Sch. Dist.*, 537 S.W.3d 142, 149 (Tex. App.—Austin 2017, no pet.). What is more, Texas courts give "a large degree of latitude" to state agencies "created to centralize expertise in a certain regulatory area." *Texas v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 197 (Tex. 1994); *Wimberley Springs Partners, Ltd. v. Wimberley Valley Watershed Ass'n*, No. 03-13-00467-CV, 2017 WL 2229876, at *3 (Tex. App.—Austin May 19, 2017, no pet.) (mem. op.) (according deference "where the statutes and rules at issue concern a matter within the core expertise of the agency").

When state agencies are charged with implementing federal law by regulation, the Court reviews that implementation "with deference" concomitant with the state agency's "broad authority" to implement the federal law. *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 394 (5th Cir. 2014) (quoting *Power Res. Grp. v. Pub. Util. Comm'n of Tex.*, 422 F.3d 231, 236 (5th Cir. 2005)); *cf. Fla. Power & Light*, 650 F.2d at 587 (acknowledging the "great flexibility accorded the states" in implementing the Act).

## ARGUMENT

What started as a broad challenge to the various technologies to be used throughout Port Arthur LNG has been winnowed down to a challenge that is not even about the technology. PACAN concedes that Port Arthur LNG's dry-low $NO_x$ burners and good combustion practices are the best available technology for controlling $NO_x$ and CO emissions, respectively; it merely takes issue with the emission limits set for those technologies. But the Commission acted reasonably in determining that the substantial evidence supporting the permit's limits was not controverted by the mere existence of a permit for a different project that has neither been constructed nor proven in practice. That conclusion was consistent with not only the unrebutted state-law presumption in Port Arthur LNG's favor, but also with the Commission's reasonable implementation of state and federal law defining

20

BACT. The Commission thus acted rationally in approving Port Arthur LNG's permit, and PACAN's petition should be denied.

## I. PACAN lacks standing to challenge the permit's CO emission limits because it does not allege any injury flowing from CO emissions.

PACAN's petition for review as to one of the permit limits must be dismissed at the threshold. That is because PACAN does not allege that it will suffer *any* harm flowing from the emission of CO. It thus lacks standing to challenge the Commission's decision to issue the permit with CO limits at 25 ppm.

Like a plaintiff filing a complaint, "a petitioner who seeks review of agency action 'invok[es] federal jurisdiction' and therefore 'bears the burden of establishing' standing." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Associations like PACAN can "assert the standing of their members." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 376–77 (5th Cir. 2021). To have associational standing, PACAN must establish: "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Ctr. for Biological Diversity*, 937 F.3d at 536 (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)).

PACAN identifies (at 20) its president, John Beard, as the individual member who gives PACAN standing. For Mr. Beard to have standing in his own right, PACAN must establish that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). Standing, however, "is not dispensed in gross; rather, plaintiffs must demonstrate standing for *each* claim that they press and for *each* form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (emphases added). To show an injury traceable to a challenged permit, petitioners "must demonstrate that the pollutants that will cause their assumed injuries will be discharged pursuant to" that permit. *Ctr. for Biological Diversity*, 937 F.3d at 544. Even if claims are "seemingly identical in all material respects" and share "seemingly intertwined fates," *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011), Article III requires petitioners to prove standing for *each* purported violation of the Act and trace it to their injuries, *see Ctr. for Biological Diversity*, 937 F.3d at 544.[7]

While the Commission afforded PACAN affected-party status, PACAN's evidence before the Commission and its briefing here alleges only harms from the

---

[7] PACAN relies heavily on this Court's decision in *Environment Texas Citizen Lobby, Inc. v. ExxonMobil Corporation*, 47 F.4th 408 (5th Cir. 2022). After PACAN filed its brief, this Court vacated that opinion and will rehear the case *en banc* in May 2023.

emission of NO$_x$ and particulate matter—*not* CO.  PACAN Br. 22 (alleging "releases of nitrogen dioxide ('NO$_2$') and dangerous particulate matter ('PM$_{2.5}$') will fall on Mr. Beard's property less than four miles from the proposed facility and at levels large enough to increase his risk of a variety of negative health effects"), 22–23 (the "new facility will cause increases in the concentrations of at least two air pollutants at Mr. Beard's home," referring to NO$_2$ and PM$_{2.5}$), 23–24 (citing testimony regarding "the level of NO$_2$" that Beard will experience, which PACAN says will "increase his risk of negative health effects").  Though a party may have some sort of standing before an administrative agency, that is not alone enough to confer Article III standing over all aspects of a petition for review.  *See Brazoria County v. EEOC*, 391 F.3d 685, 691 (5th Cir. 2004) (quoting *Hydro Invs. v. FERC*, 351 F.3d 1192, 1197 (D.C. Cir. 2003)) ("Administrative agencies need not adjudicate only Article III cases and controversies, but federal courts must."); *see also Pennzoil Co. v. FERC*, 645 F.2d 360, 391 (5th Cir. 1981) ("Concepts of administrative standing are not congruent with [A]rticle III case or controversy standing requirements.").

PACAN has failed to include in its opening brief any injury to its sole identified member that will be traceable to Port Arthur LNG's emission of CO.  *Ctr. for Biological Diversity*, 937 F.3d at 542 ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.").  Accordingly,

23

PACAN lacks standing to challenge whether the permit's CO emission limit is BACT.

## II.   The Act gives the Commission discretion to consider BACT on a case-by-case basis under Texas's PSD SIP.

Even if PACAN has standing, its challenge fails on the merits.  As discussed above, the Clean Air Act sets substantive requirements for states to follow in implementing their PSD programs.  42 U.S.C. § 7475.  Once EPA determined that Texas's PSD SIP satisfied the Act and performed its ministerial function of approving it, the Commission was empowered to implement the PSD program under that SIP, i.e., state law.  *See CleanCOALition*, 536 F.3d at 472–73.  PACAN argues that the Act defines BACT and that only EPA's guidance and interpretations of that definition matter.  The former is correct (but beside the point here); the latter is wrong altogether.

As an initial matter, PACAN accurately notes that the Act provides a substantive definition of the meaning of BACT.  *See* 42 U.S.C. § 7479(3); *supra* at 8.  That definition is mirrored in EPA's regulation, 40 C.F.R. § 52.21(b)(12), which in turn is incorporated into Texas's rules as part of its PSD SIP, 30 Tex. Admin. Code § 116.160(c)(1)(A).  Thus, it cannot be disputed that the Commission applies BACT precisely as the Act defines it.   PACAN gets off track because it misapprehends *EPA's* role in implementing that definition.

24

This misunderstanding is exemplified by PACAN's contention that the Texas PSD SIP "binds Texas to the interpretations and guidance made by EPA with regard to PSD." PACAN Br. 38. For support, PACAN goes on: "As EPA stated when it approved Texas'[s] PSD program, '[A]ction by the EPA to approve this PSD program as part of the [State Implementation Plan] will have the effect of requiring the state to follow EPA's current and future interpretations of the Act's PSD provisions and EPA regulations, as well as EPA's operating policies and guidance[.]" *Id.* (quoting 54 Fed. Reg. 52,823, 52,824 (Dec. 22, 1989)).

That quotation would be strong support for PACAN's position if it reflected EPA's position. But PACAN is quoting from EPA's *proposed* approval of Texas's PSD SIP. 54 Fed. Reg. at 52,823 ("The purpose of this Federal Register notice is to *propose* approval of [Texas's PSD SIP]." (emphasis added)). When it came time to *finalize* that rule, EPA stated in no uncertain terms that "EPA did *not* intend to suggest [in its proposed rule] that Texas is required to follow EPA's interpretations and guidance issued under the Act[.]" 57 Fed. Reg. at 28,095 (emphasis added). Correcting that misimpression, EPA noted:

> EPA acknowledges that states have the primary role in administering and enforcing the various components of the PSD program. States have been largely successful in this effort, and EPA's involvement in interpretative and enforcement issues is limited to only a small number of cases. Consequently, EPA's continuing oversight role under the Act leaves Texas and other states with

> considerable discretion to implement the PSD program as
> they see fit.

*Id.* This language is not just significant for Texas's PSD SIP—the Supreme Court quoted it approvingly when describing EPA's limited role in overseeing the states' implementation of their respective PSD programs. *See Alaska*, 540 U.S. at 491.

PACAN's misunderstanding of EPA's function colors its entire explanation of Texas's PSD Program. Compare EPA's own view of Texas's "primary role" and "considerable discretion" with PACAN's repeated invocation (at 39–41) of EPA's NSR Manual and decisions from EPA's Environmental Appeals Board, treating the Commission's years of guidance and expertise in implementing the PSD Program as an afterthought. Though PACAN may not desire a PSD Program governed by Texas law and implemented by the Commission, that is the program prescribed by the Act. *See id.*; *CleanCOALition*, 536 F.3d at 473.

Properly understood, then, the Act gives the Commission broad discretion to administer the PSD program in line with Texas's PSD SIP. The Commission is not bound by EPA guidance on BACT. Rather, the Commission determines what constitutes BACT on a case-by-case basis in light of the record evidence regarding what technology (or emission limits) is technically feasible and economically reasonable under the circumstances. *See* Tex. Health & Safety Code § 382.0518(b)(1); 30 Tex. Admin. Code §§ 116.111(a)(2)(C), 116.160(c)(1)(A). Texas law also provides a statutory presumption in Port Arthur LNG's favor because

the Commission's executive director preliminarily approved its draft permit. Tex. Gov't Code § 2003.047(i-1)–(i-2). And applying substantial-evidence review under Texas law, the Court should affirm if there is a reasonable basis in the record for the Commission's approval of the permit.

Viewed through the proper lens, as discussed below, the Commission's decision was more than just reasonable, it was unqualifiedly correct.

## III. The Commission's approval of Port Arthur LNG's permit was supported by substantial evidence.

Applying the appropriately deferential standard of review, substantial evidence supports the Commission's conclusion that Port Arthur LNG's proposed emission limits were BACT for CO and $NO_x$. PACAN cannot come close to overriding this evidence with its insistence on a wooden rule that any approved permit limit for another facility automatically and immediately establishes BACT, even when those limits have not been demonstrated in practice. PACAN's position is contradicted by express TCEQ guidance and expert testimony, and it is unsupported by any case law or binding regulatory authority. By contrast, TCEQ's balanced position is consistent with Texas law, the Clean Air Act, and common sense.

### A. The record contains substantial evidence that Port Arthur LNG's proposed emission limits were BACT.

Under Texas law, this Court's review is limited to determining whether there is *some* reasonable basis for the Commission's decision, and the Court must affirm

27

if there is more than a scintilla of evidence supporting it. *Tex. Indus. Energy Consumers*, 324 S.W.3d at 105 n.60. This substantial-evidence standard ultimately amounts to a "rational-basis test" for determining whether the Commission's decision "finds reasonable support in the record." *Jenkins*, 537 S.W.3d at 149. Because Port Arthur LNG provided more than enough evidence of the proper BACT emission limits, the Commission's approval was proper.

1.      Start with Port Arthur LNG's permit application. The application detailed how Port Arthur LNG would employ cutting-edge technology to limit its emissions of regulated pollutants, providing the required emissions estimates and calculations for each aspect of the proposed project. ROA.13911–14585. Notably, these proposals were identical to those the Commission previously approved for identical turbines at the same project site. ROA.6356. For the refrigeration turbines at issue here, Port Arthur LNG explained that its use of dry-low $NO_x$ burners and good combustion practices would limit emissions "*better than* BACT for $NO_x$ and CO." ROA.13911 (emphasis added). Port Arthur LNG analyzed BACT under both the Commission's three-tiered approach and EPA's top-down approach. ROA.13998–99.[8]

---

[8] Port Arthur LNG also analyzed BACT for several of its other emissions sources and for pollutants other than $NO_x$ and CO. PACAN no longer challenges the BACT technology or emission limits on any of the project's other emissions sources, nor does it challenge the permit's limits on pollutants other than $NO_x$ or CO.

Consistent with the Commission's tiered approach, Port Arthur LNG analyzed its implementation of BACT for both CO and $NO_x$ limits.  Starting with CO, Port Arthur LNG determined that the refrigeration turbines would best limit CO emission by "utiliz[ing] good combustion practices," which it explained was "consistent with the TCEQ's established Tier I BACT requirements for gas-fired, simple cycle combustion turbines in electric service according to TCEQ's *Current Tier 1 BACT Requirements: Combustion Services.*"  ROA.14107–08.  It also identified other "recent final permit actions for other refrigeration" turbines that were consistent with this proposal.  ROA.14108.  Using good combustion practices, Port Arthur LNG expected BACT CO emissions not to exceed 25 ppm.  ROA.14107.

For $NO_x$ emissions, Port Arthur LNG identified dry-low $NO_x$ burner technology and "water injection technologies," determining that the former was "regarded as a major advance over" the latter.  ROA.14108.  Not only was this BACT control consistent with another recent permit (Cameron LNG), it was also *more efficient* than other similar projects like Corpus Christi Liquefaction, LLC and Sabine Pass LLC—both of which had permits approved with water-injection technologies and "good combustion practices" as BACT in recent years.  ROA.14108–09.  Employing this technology, Port Arthur LNG estimated that its BACT $NO_x$ emissions would not exceed 9 ppm.  ROA.14109.

Turning to EPA's "top-down" approach, Port Arthur LNG analyzed BACT for $NO_x$ and CO on the refrigeration turbines. ROA.14025–44. For $NO_x$ at step one, Port Arthur LNG considered five ostensible options: (1) dry-low $NO_x$ burners; (2) water-steam injection; (3) selective non-catalytic reduction (SNCR); (4) selective catalytic reduction (SCR); and (5) EMx control systems. ROA.14026–30. At step two, Port Arthur LNG eliminated SNCR and EMx as technically infeasible because their operation temperatures were inconsistent with the temperatures reached by the refrigeration turbines. ROA.14031. At step three, it ranked the remaining technologies by their effectiveness in controlling $NO_x$: (1) SCR with 70–90% reduction; (2) dry-low $NO_x$ burners at 15 ppm; and (3) water-steam injection at 25 ppm. ROA.14031–32. At step four, though SCR was the "most effective control technology" for the refrigeration turbines, its cost (ranging from $20,454 to $27,880 per ton of $NO_x$ controlled) made it economically unreasonable. ROA.14032–33. For the dry-low $NO_x$ burners, though it was demonstrated that they could control $NO_x$ emissions to 15 ppm, Port Arthur LNG believed that a *lower* emissions rate was achievable based on its own experience using similar turbines at a different project. *Id.* Thus, in step five, it identified dry-low $NO_x$ burners as BACT at an emission rate *beyond* BACT—that is, at 9 ppm rather than 15 ppm. ROA.14033–34.

Port Arthur LNG next evaluated BACT for the turbines' CO emissions. ROA.14038. At steps one and two, it identified two potential control technologies

which were both technically feasible: (1) good combustion practices; and (2) catalytic oxidation. ROA.14038–39. Ranking those at step three for efficiency, catalytic oxidation reduced CO emissions by 80–90%, while good combustion practices could limit CO emissions to as low as 15 ppm. ROA.14039–40. Catalytic oxidation, however, costs roughly $5,005 per ton of CO controlled, which is considered cost-prohibitive and thus economically unreasonable at step four. *Id.* At step five, Port Arthur LNG identified various permits that contained BACT emission limits ranging from 6 ppm to 58.4 ppm using good combustion practices. ROA.14039, 14041–44. It concluded that a CO limit of 25 ppm was consistent with other recent PSD permits, excluding those that exceeded BACT, and consistent with Port Arthur LNG's *beyond*-BACT $NO_x$ limit. ROA.14043–44.[9]

The Commission's executive director then evaluated Port Arthur LNG's extensive analysis. Correspondence in the record indicates that Dr. Hansen, the engineer in charge of reviewing the permit application, requested additional information beyond the evidence included in the permit application. ROA.63–65. Port Arthur LNG responded with even more evidence, including proprietary data

---

[9] Port Arthur LNG noted that, generally, "emissions of $NO_x$ and CO are inversely related (i.e., decreasing $NO_x$ emissions will result in an increase in CO emissions and vice-versa)." ROA.14038. "Accordingly, combustion controls designed to lower $NO_x$ emissions (e.g., lower combustion temperatures) would also be expected to cause a collateral increase in CO emissions. Therefore, combustion design of operation requires a balancing of the competing goals to minimize the formation of both $NO_x$ and CO." *Id.*

from General Electric about the operation of the compression turbines. ROA.73–81. The Commission's air-quality experts also discussed with Port Arthur LNG's experts the need for further information to complete their review, ROA.54–59, and Port Arthur LNG promptly complied by delivering even more data backing up its proposal, ROA.82–94.

The Commission's executive director next performed a technical review applying the three-tiered and top-down approaches. ROA.5040–41. The executive director also performed an air-quality analysis audit and a health-effects review, both of which analyzed the BACT determinations and their effects on the environment. ROA.5018–36. Through this thorough review, the Commission's executive director determined that Port Arthur LNG's proposed permit complied with Texas law (i.e., Texas's PSD SIP). ROA.4968.

Thus, both Port Arthur LNG and the Commission's executive director surveyed the technical evidence and determined that, by any measure, the proposed emission limits for $NO_x$ and CO were BACT.

**2.** But the evidence does not stop there. By the time PACAN challenged the permit at the contested hearing, Port Arthur LNG already had a statutory presumption that its proposal satisfied state and federal law. Tex. Gov't Code § 2003.047(i-1)–(i-2) (preliminary approval of PSD permit by Commission's executive director confers a statutory presumption of the permit's consistency with

state and federal law). At the hearing, Port Arthur LNG and the Commission's executive director introduced extensive expert testimony explaining the soundness of their BACT conclusions. Much of the fanfare at the hearing concerned PACAN's now-abandoned demands for various cost-prohibitive control technologies (*e.g.,* SCR, catalytic oxidation) for each of the project's emissions sources. *E.g.,* ROA.6052–61. Relevant here, however, PACAN argued that a permit issued to Rio Grande LNG in *November 2021*—over two years *after* Port Arthur LNG applied for the PSD permit and a month *after* the Commission's executive director proposed to approve the permit—established new, lower BACT emission limits for $NO_x$ (dry-low burners at 5 ppm) and CO (good combustion practices at 15 ppm). ROA.12880. Rio Grande LNG was originally permitted in 2018 for $NO_x$ and CO limits using the same BACT limits that Port Arthur LNG proposed, ROA.11808, 11811, but in November 2021, it re-submitted its application with revised BACT limits, ROA.12877, 12880. This meant, said PACAN, that all of Port Arthur LNG's extensive evidence and the Commission's independent review were no longer relevant in light of Rio Grande LNG's updated emission limits.

Port Arthur LNG and the Commission's executive director, however, proffered expert testimony explaining that BACT is *not* established by the mere issuance of a permit regardless of all other record evidence. ROA.13547; ROA.13517–18. One expert, Dr. Hansen, was the senior engineer at the Commission who performed the

33

review of Port Arthur LNG's permit application. ROA.408. The experts noted that permits sometimes contain emission limits that are *beyond* BACT, such that requiring an emission limit as BACT that has not been proven in practice defies "common sense." *See* ROA.13547. Rather, BACT must be established "in practice" to justify holding a project to that standard, given the steep costs of non-compliance. *Id.*; *see* 42 U.S.C. § 7413(b)(1). In response, PACAN's own expert could not identify any legal authority for the proposition that a permitted limit becomes BACT merely by its existence, rather than through proven practice. ROA.12975–76.

Considering the statutory presumption in Port Arthur LNG's favor, this additional expert evidence buttressed the already substantial evidence supporting its permit application. Given the absence of any rebuttal *evidence* of achievability for more-stringent emission limits in practice, the Commission reasonably concluded that Port Arthur LNG established its entitlement to the PSD permit. Because that decision was supported by far more than a scintilla of evidence, the Court should affirm that decision by denying PACAN's petition.

**B.    The existence of another permit with lower emission limits, without evidence establishing BACT in practice, does not rebut Port Arthur LNG's substantial evidence and statutory presumption of validity.**

PACAN's sole rebuttal to Port Arthur LNG's substantial evidence and the Commission's thorough review is the existence of the Rio Grande LNG permit— issued over two years after Port Arthur LNG's permit application and a month after

the Commission's executive director proposed to approve the permit. But the mere existence of an emission limit in another permit—undemonstrated in practice—does not override Port Arthur LNG's substantial evidence as a matter of law, or even as a matter of common sense.

**1.** First and foremost, state and federal law do not support PACAN's bright-line "permitted-but-unproven" rule. Start with the source in the federal Act. It defines BACT as an "emissions limit based on the maximum degree of reduction" of a pollutant "which the permitting authority, *on a case-by-case basis*, taking into account energy, environmental, and economic impacts and other costs, determines is *achievable* for such facility." 42 U.S.C. § 7479(3) (emphases added); *see* 30 Tex. Admin. Code § 116.160(c)(1)(A) (incorporating the same). The question is not the "maximum degree of reduction" in some abstract or speculative sense, but what is *achievable* on a case-by-case basis considering the various costs and impacts. The text thus does not lend itself to bright-line rules of any kind.

Next consider how the Commission has exercised its considerable discretion in administering the PSD program. *See Alaska*, 540 U.S. at 491 (citing 57 Fed. Reg. at 28,095). The Commission has defined what is *achievable* as "an air pollution control method" that (1) "*through experience* and research," (2) "has *proven to be operational*, obtainable, and capable of reducing or eliminating emissions from the facility," and (3) "is considered *technically practical* and economically reasonable

35

for the facility." 30 Tex. Admin. Code § 116.10(1) (emphases added); ROA.7249 (TCEQ's guidance indicating that BACT is based on the "maximum degree of emission reductions (considering energy, environmental, and economic impacts) *achievable* through application of production processes and available methods, systems, and techniques" (emphasis added)). The Commission thus reasonably evaluates what is *achievable* by considering real-world, operational experience. While PACAN insists that the Commission's approach conflicts with a nonbinding EPA manual, *see supra* at 24–27, it does not and cannot meaningfully argue that it conflicts with the Act's flexible definition of BACT.[10] *See Exelon*, 766 F.3d at 394 (deferring to state agency charged with implementing federal law where that law gives state agency broad implementation powers); *see also Texas v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 197 (Tex. 1994) ("When an administrative agency is created to centralize expertise in a certain regulatory area, it is given a large degree of latitude in the methods it uses to accomplish its regulatory functions.").

Both the Commission's and EPA's guidance back up that understanding of BACT. The Commission's guidance, for instance, says that to be considered BACT, "the emission reduction option(s) should have been successfully demonstrated in

---

[10] In any event, EPA's NSR Manual is not as rigid in its position regarding permitted-but-unconstructed technology or emission limits as PACAN suggests: "[A] permit requiring the application of a certain technology or emission limit to be achieved for such technology *usually* is sufficient justification to assume the technical feasibility of that technology or emission limit." ROA.8892 (emphasis added).

Texas and the United States." ROA.7247 (TCEQ's Air Pollution Control Guide). It also acknowledges that some applicants "may propose control(s) that are *beyond* accepted BACT (i.e., resulting in emission reductions that are higher than accepted BACT)." ROA.7243 (emphasis added). These beyond-BACT limits are helpful to the continued improvement of emission-limiting technologies, to be sure. ROA.13547. But a technology goes from "beyond BACT" to "BACT" when it has a proven track record for *achieving* the improved limits, such that it would be reasonable to bind all other similar applicants to that level of technology. *Id.* The Commission's approach allows projects to identify and operate within a "compliance margin," ROA.7245, and anticipate what is "achievable as a practical matter under all reasonably foreseeable worst-case operating conditions for the life of the facility," ROA.37913; *see* ROA.7185–86.

EPA's guidance reinforces this conclusion. For EPA's top-down method, its guidance indicates that at step one the technology must have "already been *demonstrated in practice*." ROA.10743 (emphasis added) (EPA's New Source Review Manual). "Technologies which have not yet been applied to (or permitted for) full scale operations *need not be considered available.*" *Id.* (emphasis added). In other words, according to EPA, a beyond-BACT emission limit barely makes it out of the starting gate, as an applicant is not required to include it in the analysis if there is not a proven track record of its achievability. ROA.10744 ("To satisfy the

legislative requirements of BACT, EPA believes that the applicant must focus on technologies with a demonstrated potential to achieve the highest levels of control."). This is important because, as with the Commission's guidance, EPA concurs that these limits must be "met on a continual basis at all levels of operation," indicating the need for a degree of flexibility and compliance margin to account for conditions at the facility. ROA.7412; *see* ROA.7571 (EPA's guidance indicating that "performance tests should be conducted at worst case operating (non-malfunction) conditions" to "determine both emissions and control equipment efficiency").

An example illustrates how this works in practice. Sempra Infrastructure (owner of Port Arthur LNG) previously built and now operates another LNG project named Cameron LNG. *See* ROA.7174–75. Cameron LNG used an older model of the same refrigeration turbines being proposed for Port Arthur LNG. *See id.* While Cameron LNG was permitted at emission limits for $NO_x$ of 15 ppm, in practice, the data from the turbines indicated that the dry-low $NO_x$ technology would consistently limit $NO_x$ emissions to at or below 9 ppm. ROA.7175. So when Sempra applied for permits for Port Arthur LNG, rather than strictly rely on other permits (which would have put BACT at 15 ppm), Port Arthur LNG instead used 9 ppm as BACT for $NO_x$ emissions. *Id.* This example not only illustrates how BACT evolves and improves with *evidence* of achievability, but also that a proper BACT analysis considers the

38

applicant's knowledge and experience in operating facilities similar to those for which it seeks permits.

PACAN, for its part, cites no statute, no case law, and no binding regulatory authority that would compel the Commission to reject Port Arthur LNG's BACT limits in favor of unproven emission limits at another proposed facility. Given TCEQ's wide discretion in executing PSD permits and the deferential standard of review, PACAN falls far short of justifying vacatur of the Commission's decision.[11]

**2.**      Both common sense and the procedural history of this case drive home why BACT is not automatically established by the issuance of another permit with unproven emission limits. Port Arthur LNG spent years undergoing a thorough technical review to determine how it could best limit its emissions. ROA.13303. It considered all of its options and reached a result that, at the time, was *beyond* BACT for $NO_x$ emissions and was BACT for CO emissions given other *established*

---

[11] After the contested hearing and months after the administrative record was closed, PACAN attempted to introduce and rely on a letter from an EPA Region 6 staffer that stated a different interpretation of EPA's nonbinding guidance. PACAN Br. 11–12, 55–58. Because this letter was not before the ALJs in the contested hearing, the Commission refused to consider it in reaching its decision. ROA.6500. And because it was not before the Commission, it is not properly before this Court, either. *See* Tex. Gov't Code § 2003.047(m); *Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*, 153 S.W.3d 174, 196–197 (Tex. App.—Austin 2004, pet. denied) (agency properly declined to reopen record after agency order had already issued). EPA received notice of the draft permit, ROA.15–16, and had the opportunity to participate in the year-long notice-and-comment process, or in the contested hearing, or to provide *any* kind of input over the years between when notice issued in September 2019 and when the record closed in March 2022. It declined to do so. While EPA may play an advisory role in the Texas-administered permitting process—and maintains a limited *post hoc* enforcement role, *see supra* at 6–7—the Commission was not required to consider the regional staffer's late-breaking letter in its decisional process.

projects.    ROA.14033–34.    This review was independently confirmed by the Commission's own experts, who agreed that Port Arthur LNG proposed BACT emission limits for $NO_x$ and CO.   ROA.435.   Based on the law and the guidance of those charged with implementing it, the Commission properly considered comparable facilities that had achieved those limits in practice, not just on paper. ROA.6372–73.

Enter Rio Grande LNG.   The unexplained revisions to Rio Grande LNG's application, permitted two years *after* Port Arthur LNG filed its application, are based on data and purported manufacturer guarantees that are *not even in the record*. *See supra* at 14 n.6; Tex. Gov't Code § 2003.047(m) (the Commission's decision "shall be based solely on the record made before the administrative law judge"). PACAN nonetheless urges that alleged promises of never-before-achieved emission limits should immediately crystalize BACT for all permit applicants, overriding a record that contains technical analysis of these controls and Port Arthur LNG's manufacturer data indicating that the turbines could operate at its proposed limits. ROA.73–74, 7185, 33116–17.   Without even a shovel of dirt being turned at Rio Grande LNG, there is no way to know if those late-breaking emission limits are even possible, especially given the sparse record evidence here.    Even if newly permitted—but unconstructed—projects could be relevant to determining BACT in

some cases, this would not be the case to declare that unproven emission limits automatically establish BACT as a matter of law.

Indeed, PACAN's wooden approach is unworkable in the real world. PSD permitting proceedings for a large facility may last years, with the facility becoming operational only several years later.[12] These efforts require years of planning and billions of dollars of investment. But under PACAN's theory, the emergence of an untested permit at the eleventh hour would immediately jettison the company's permit application and require the company to return to square one. Or if the company rolled the dice and accepted the stricter limitations, it would risk untold liability from regulators and citizen–plaintiffs based on unproven promises from manufacturers to *other* companies. Neither investors nor rational executives would undertake a decades-long project to build essential infrastructure under those circumstances.

---

[12] Consider that earlier this month, Sempra (owner of Port Arthur LNG) announced that it would officially begin the construction of its first two liquefaction trains and that the "expected commercial operation dates for Train 1 and Train 2"—permitted in February 2016—"are 2027 and 2028, respectively." *Sempra Launches Port Arthur LNG Project* (Mar. 20, 2023), https://www.sempra.com/sempra-launches-port-arthur-lng-project; *see* Jacob Dick, *NextDecade Urges FERC to Act on Rio Grande LNG Approval*, Natural Gas Intelligence (Feb. 7, 2023), https://www.naturalgasintel.com/nextdecade-urges-ferc-to-act-on-rio-grande-lng-approval/ (noting that Rio Grande LNG is expected to complete the project by 2028 after regulatory delays and legal challenges).

\* \* \*

The sounder approach is the one the Commission took here. It has consistently maintained that BACT is based on *evidence* of achievability, not the mere *anticipation* or *expectation* of it. On this record, there is substantial evidence supporting Port Arthur LNG's proposed BACT emission limits: 9 ppm for $NO_x$, 25 ppm for CO. An untested permit based on a manufacturer's promise that is *not even in the record* cannot override that substantial evidence as a matter of law. Accordingly, the Commission properly granted Port Arthur LNG's PSD permit, and the Court should deny PACAN's petition.

## CONCLUSION

For these reasons, this Court should deny PACAN's petition for review.

March 31, 2023                              Respectfully submitted,


By:  */s/ Aaron M. Streett*
      Aaron M. Streett
      Beau Carter
      BAKER BOTTS L.L.P.
      910 Louisiana Street
      Houston, TX 77002
      Tel.: (713) 229-1855

      Derek R. McDonald
      BAKER BOTTS L.L.P.
      401 South 1st Street, Suite 1300
      Austin, TX 78704
      Tel.: (512) 322-2667

      *Counsel for Intervenor–Respondent*
      *Port Arthur LNG, LLC*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,760 words, including the portions of other briefs incorporated by reference and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman font, size 14.

*/s/ Aaron M. Streett*
Aaron M. Streett

## CERTIFICATE OF SERVICE

On this 31st day of March, 2023, a true and correct copy of the foregoing was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the Fifth Circuit, which currently provides electronic service on all counsel of record.

*/s/ Aaron M. Streett*
Aaron M. Streett