# Supreme Court of Texas

No. 24-0116

Port Arthur Community Action Network,
*Petitioner*,

v.

Texas Commission on Environmental Quality; Jon Niermann, in his Official Capacity as Chairman of the Texas Commission on Environmental Quality,
*Respondents*

On Certified Question from the United States
Court of Appeals for the Fifth Circuit

**Argued October 2, 2024**

CHIEF JUSTICE BLACKLOCK delivered the opinion of the Court.

Justice Young and Justice Sullivan did not participate in the decision.

The Fifth Circuit certified to this Court the following question:

Does the phrase "has proven to be operational" in Texas's definition of "best available control technology" codified at Section 116.10(1) of the Texas Administrative Code require an air pollution control method to be currently operating under a permit issued by the Texas Commission on

>Environmental Quality, or does it refer to methods that TCEQ deems to be capable of operating in the future?

*Port Arthur Cmty. Action Network v. Tex. Comm'n on Env't Quality*, 92 F.4th 1150, 1152 (5th Cir. 2024). The underlying litigation about the permitting of a power plant is not pending in this Court. We nevertheless have jurisdiction to issue an otherwise impermissible advisory opinion answering the Fifth Circuit's question only because the Texas Constitution authorizes us "to answer questions of state law certified from a federal appellate court." TEX. CONST. art. V, § 3-c. We accepted the certified question. The parties, as well as several helpful amici, have provided briefing and argument, for which we are appreciative.

The certified question asks about a provision of the "Texas Administrative Code," which is a compilation of administrative rules promulgated by Texas executive-branch agencies pursuant to rulemaking authority granted by the Texas Legislature.[1] Texas administrative rules derive all their legal force from the Texas statutes authorizing the rules. *R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex. 1992). Administrative rules are an inferior source of law as compared to the statutes from which they derive their authority, but the familiar rules of statutory interpretation generally apply with equal force to the judicial application of administrative rules. Thus, just as with the statutes on which they rely for authority, state-agency administrative rules should be applied by courts based first

---

[1] *See generally* TEX. ADMIN. CODE, *available at* https://texreg.sos.state.tx.us/public/readtac$ext.viewtac.

and foremost on a natural reading of their plain text. *Tex. Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 544 (Tex. 2022). When a state agency adopts an administrative rule, it commits itself to follow the plain meaning of the promulgated text, which courts should interpret as they would a statute—while keeping in mind the rule's inferior status relative to statutes. Parties affected by the rule, in turn, should be able to rely on both the agency and the courts to apply the plain text of the rule as it is written.

We therefore focus our interpretation of the disputed administrative rule on its text. *See BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017) ("The text is the alpha and the omega of the interpretive process."). Section 116.10(1) of Title 30 of the Texas Administrative Code, about which the Fifth Circuit asks, is a definition of "best available control technology (BACT)" promulgated by the Texas Commission on Environmental Quality (TCEQ) pursuant to the rulemaking authority granted to TCEQ by the Texas Clean Air Act, codified as Chapter 382 of the Texas Health and Safety Code. "BACT" is a ubiquitous concept in the elaborate, overlapping regulatory apparatus governing air-pollution permits at both the federal and state levels. *See, e.g.*, 42 U.S.C. § 7475(a)(4); TEX. HEALTH & SAFETY CODE § 382.0518(b)(1).

We are not concerned here with any aspect of federal law or with any regulation or action of the federal Environmental Protection Agency. Our jurisdiction in this matter extends only "to questions of state law." TEX. CONST. art. V, § 3-c. The content and meaning of a Texas administrative rule is purely a question of Texas law over which

3

the People of Texas—not Congress or federal executive-branch agencies—exercise ultimate control. Our job as a Texas court answering a question of Texas law is not to make the words of the Texas Administrative Code fit neatly within a multifaceted regime of so-called "cooperative federalism." Our job instead is to say what the words mean. If the answer is thought to be disconsonant with some aspect of federal law, it is for others to decide what, if anything, should be done about it.

## I.

Although administrative rules should always be interpreted based on their plain text, the legal force of that text always derives from an act of the Texas Legislature. Thus, the best way to start understanding an administrative rule is to identify the statute from which its authority derives. Before diving headlong into textual analysis of an administrative rule, an essential first step for both courts and litigants is to understand the relevant statutory authority undergirding the rule.

We begin, therefore, with the Texas Clean Air Act, which provides that construction of a facility like the power plant at issue may not commence without a permit from TCEQ. TEX. HEALTH & SAFETY CODE § 382.0518(a). TCEQ "shall grant" such a permit "within a reasonable time" if, "from the information available to [it]," TCEQ finds that, among other things, "the proposed facility . . . will use at least the *best available control technology*, considering the technical practicability and economic

reasonableness of reducing or eliminating the emissions resulting from the facility." *Id.* § 382.0518(b) & (b)(1) (emphasis added).

Whether a given pollution control proposal qualifies as the "best available control technology" is thus vitally important to the future of any industrial project—in this case a liquefied natural gas power plant in southeast Texas—to which the requirements discussed herein apply. Unsurprisingly, proponents and opponents of new or updated facilities often disagree over whether "the proposed facility . . . will use at least the best available control technology." This is principally a *statutory* question posed by section 382.0518(b)(1) of the Health and Safety Code, not merely a question about the meaning of an administrative rule. For this reason, although the Fifth Circuit focuses our attention on an administrative rule's definition of the phrase "best available control technology," we begin by noting that the BACT requirement is a creature of the statute itself, not of the administrative rules. And, rather than leave it to TCEQ to define BACT, the Legislature chose text that casts considerable light on BACT's meaning irrespective of the contents of any administrative rule.

For instance, the statutory text dictates that identifying BACT for a project must include "consider[ation of] the *technical practicability* and *economic reasonableness* of reducing or eliminating the emissions resulting from the facility." *Id.* § 382.0518(b)(1) (emphasis added). These two considerations are statutorily mandated, and their meaning is not particularly difficult to grasp. They are the *only* elaboration the Legislature provided about what BACT means, and they should therefore be given primacy in any effort to understand BACT's meaning.

5

In a foggy sea of overlapping state and federal regulations, guidance documents, agency decisions, and judicial opinions—all of which might be thought by some observers to inform the meaning of BACT—the twin textual considerations of "technical practicability and economic reasonableness" are like a lighthouse, built on the firm foundation of the text of the Texas Clean Air Act, to which courts, agencies, and litigants should look when in doubt about the meaning of BACT under Texas law. Any interpretation of Texas's statutory BACT requirement that has the effect of downplaying or diminishing the statute's "technical practicability and economic reasonableness" mandate would be faulty from the get-go—whether the interpretation is based on a Texas administrative rule, a judicial opinion, or an action of the federal EPA.

The statute's "technical practicability and economic reasonableness" directive is by no means the only legislative indication of BACT's meaning. The disputed phrase itself—"best available control technology"—is not an inscrutable series of words devoid of meaning unless the agency provides a regulatory definition. "Control technology," in this context, obviously refers to the technology that will control air pollution. The statutory permitting scheme requires TCEQ to determine whether the proposed "control technology" is the "best available." *Id*. What counts as "best" must be judged not merely in terms of pollution reduction—which is, of course, the purpose of the exercise—but also by the mandatory textual considerations of "technical practicability and economic reasonableness." *Id*.

Crucially for purposes of this certified question, the "control technology" must also be "available." *Id*. While environmental law is

6

no stranger to arcane terminology, any English speaker would naturally expect the words "best *available* control technology" to refer to control technology that is currently available. In everyday parlance, technology that may not actually be available until the future is not "available technology." Similarly, technology that is available now is "available technology" whether or not it has previously been permitted by a government agency.

In sum, putting the regulatory definition to the side for a moment, the legislative text of section 382.0518(b)(1) already indicates that "best available control technology" is control technology that is currently available, technically practicable, and economically reasonable. Having first consulted the animating statutory text, we now proceed to analyze the text of the administrative rule about which the Fifth Circuit asks.

## II.

The Fifth Circuit asks about the following definition of BACT, found in TCEQ's administrative rules:

> Best available control technology (BACT)—An air pollution control method for a new or modified facility that through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility, and is considered technically practical and economically reasonable for the facility.

30 TEX. ADMIN. CODE § 116.10(1). To repeat, the certified question poses the following inquiry about the rule's definition:

> Does the phrase "has proven to be operational" in Texas's definition of "best available control technology" codified at Section 116.10(1) of the Texas Administrative Code require an air pollution control method to be currently operating under a permit issued by the Texas Commission on

>Environmental Quality, or does it refer to methods that TCEQ deems to be capable of operating in the future?

The certified question suggests two competing views of what the phrase "has proven to be operational" might mean. As the question frames it, the phrase contemplates either (1) an air pollution control method that is currently operating under a TCEQ permit, or (2) an air pollution control method that TCEQ deems to be capable of operating in the future. As we read the definition, however, neither of these options correctly captures the meaning of the phrase or the meaning of the definition as a whole. Thus, the simple answer to the certified question is "Neither"—although we will attempt to provide a more useful answer.

Before parsing the definition of "best available control technology," we return to the observation made above about the natural meaning of that statutory phrase. Unadorned by a regulatory definition, the phrase does not suggest either of the two understandings proffered by the certified question. Nor does anything else in the statutory text support either of those two understandings. Instead, as explained above, the statutory text suggests that BACT means the best pollution control technology that is currently available, technically practicable, and economically reasonable. *See* TEX. HEALTH & SAFETY CODE § 382.0518(b)(1). It should therefore come as no surprise (or perhaps it is a welcome surprise, depending on one's confidence in agency rulemaking) that the text of the administrative definition reads like an honest effort to further elucidate the natural, everyday meaning of the statutory text.

What is the "best available control technology" that is "technically practicable and economically reasonable"? According to the agency's

8

rule, it is control technology that "through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility, and is considered technically practical and economically reasonable for the facility." 30 TEX. ADMIN. CODE § 116.10(1). This definition elaborates on the agency's understanding of what it means for control technology to be "technically practicable," "economically reasonable," and the "best available," as the statute requires. To satisfy the statutory BACT requirement, in the agency's view, the technology must be "operational," "obtainable," and "capable of reducing or eliminating emissions"—in addition to "technically practical" and "economically reasonable." The agency will decide whether the technology is "operational," "obtainable," and "capable of reducing or eliminating emissions" by asking whether the technology "has proven" to have these characteristics "through experience and research." *Id*.

Nothing about this definition indicates that a pollution control technology's capability of operating in the future has anything to do with the analysis. By using the perfect-tense "has proven," the rule refers to matters already proven in the past. In order to say that a technology "has proven to be operational," we must already have the proof in hand. If all we have are educated guesses about the technology's operability tomorrow, we cannot truthfully say today that the technology "has proven to be operational"—even if we suspect that it could be operated.

The definition's requirement of proof "through experience and research" further forecloses the view that theoretical speculation about future capabilities plays any role in the BACT inquiry. If the definition

9

allowed proof by experience *or* research, then perhaps theoretical proof based on speculative research would suffice. By requiring proof "through experience *and* research," the definition requires that the pollution control method has already been demonstrated to be operational in the real world. Theoretical proof of a method's operability in the future is not enough.

The certified question essentially asks how TCEQ should decide whether a pollution control method "has proven to be operational." The disputed definition provides the answer to that question by directing that the proof must come "through experience and research," which we understand to mean demonstrated, real-world experience rather than the experience of previous permit applications. By asking whether a technology "has proven," "through experience and research," to be "operational," "obtainable," and "capable of reducing or eliminating emissions," the rule asks an empirical question that looks to past experience and research. As defined in the rule, BACT is technology that has *already* proven, through experience and research, to be operational, obtainable, and capable of reducing emissions. We must therefore reject the certified question's suggestion that BACT might include "methods that TCEQ deems to be capable of operating in the future."

We must also reject the alternative view posed in the certified question—that the BACT inquiry turns somehow on whether a proposed pollution control method is currently operating under a TCEQ permit. The issuance of similar permits in the past may of course be *relevant* to whether a pollution control method has proven, through experience and

10

research, to be operational, etc. But neither the statute nor the rule can support the notion that a pollution control method is not BACT unless it has previously been permitted by TCEQ.

Perhaps more relevant here, neither the statute nor the rule can support the notion—advanced by the opponents of the disputed power plant in this case—that if a permit has previously been issued to another facility at a given degree of pollution control, then in the future all similar facilities must propose at least as rigorous a degree of pollution control in order to satisfy the BACT requirement. The argument, in other words, is that by issuing a permit to Facility A approving control technology that achieves a certain degree of pollution reduction, TCEQ has found that Facility A's proposed control technology is BACT for all such facilities. Under this view, if Facility B submits a permit application proposing a lesser degree of pollution control than Facility A, TCEQ must deny the permit because Facility B's proposal is not BACT. This is incorrect. The principal reason it is incorrect becomes clear as soon as we zoom out from TCEQ's administrative definition of BACT and once again consider the animating statute.

By statute, TCEQ has an *obligation* to issue a permit if it finds, among other things, that the proposed facility "will use *at least* the best available control technology." TEX. HEALTH & SAFETY CODE § 382.0518(b)(1) (emphasis added); *id.* § 382.0518(b) (providing that TCEQ "shall grant" a permit if it makes the relevant findings). Thus, when Facility A applies for a permit, TCEQ's inquiry is not whether Facility A's proposed control technology is BACT for all such facilities. Instead, the inquiry is whether Facility A's proposal is *at least* BACT,

11

meaning that the proposal controls pollution *at least* as much as would the "best available control technology." This means that if Facility A proposes to control pollution to a degree that is actually beyond what is currently available, technically practical, and economically reasonable, then TCEQ is statutorily required to issue the permit to Facility A. TCEQ's issuance of a permit to Facility A is therefore not a finding by TCEQ that future, similar facilities must meet the pollution control standards in Facility A's permit. It is merely a finding that Facility A "will use *at least* the best available control technology." *Id.* § 382.0518(b)(1) (emphasis added). Such a finding does not necessarily tell us anything about BACT for Facility B.

For this reason, the existence of a previous permit issued to Facility A does not necessarily have any bearing on the standards Facility B must meet to satisfy the BACT requirement. If a dispute arises over whether Facility B's proposal is "at least BACT," resolution of the dispute requires analysis of the statutory and regulatory elements of the definition of BACT as applied to Facility B, an inquiry that must be grounded in real-world experience and research. The contents of past permits issued to similarly situated applicants may certainly have some relevance to that inquiry—perhaps a great deal of relevance, depending on the circumstances. Like any government agency, TCEQ is obligated to apply the law equally and therefore to treat like applicants alike. But when a previously permitted facility has not yet been built—as appears to be the case here—its example will often be of limited usefulness in determining the degree of pollution control that "has proven," "through experience and research," to be "operational," "obtainable," etc. *See*

12

30 TEX. ADMIN. CODE § 116.10(1); TEX. HEALTH & SAFETY CODE § 382.0518(b)(1).

For these reasons, previously issued permits are not determinative of BACT in the way the power plant's opponents have suggested in this case.[2] A previously permitted emissions level for one facility is neither necessary nor sufficient to establish BACT for other, similar facilities.

---

[2] To the extent any party argues that the outcome of the underlying federal litigation should turn on considerations of federal law—such as federal statutes, EPA regulations, or other "guidance" or actions by the EPA—we make no comment on those arguments. Our certified-question jurisdiction is limited to "questions of state law." TEX. CONST. art. V, § 3-c. To the extent the Fifth Circuit is of the view that the outcome of the underlying federal litigation turns on the answer to this certified question of state law, we have endeavored to answer the state-law question under the principles of Texas law applicable to the interpretation of administrative rules and statutes. We have not considered the federal-law question of whether some aspect of federal environmental law—or some amorphous federal-law notion of "cooperative federalism"—might purport to obligate state courts to interpret state law any differently than we normally would. Nor have we considered the related question of whether federal law could validly impose any such obligation on state courts, although we are aware of no constitutional principle by which any element of the federal government could interfere with the state courts' interpretation of state law.

Finally, if the state-law question addressed herein truly resolves the federal litigation pending in the Fifth Circuit, some close observers might ask whether this litigation genuinely raises the federal question required for federal jurisdiction. *See* 28 U.S.C. § 1331. Indeed, one close observer—the Governor of Texas—has submitted an amicus brief raising precisely that question. As a matter of the Fifth Circuit's precedent, the answer to this federal-law question may be informed by *Sierra Club v. Louisiana Department of Environmental Quality*, 100 F.4th 555, 564 (5th Cir. 2024). As a matter of first principles, we make no comment on the matter—nor could we properly do so given our limited jurisdiction to answer only "questions of state law." TEX. CONST. art. V, § 3-c.

_____
James D. Blacklock
Chief Justice

**OPINION DELIVERED:** February 14, 2025